# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF TEXAS
# DALLAS DIVISION

| | | |
|---|---|---|
| **LAURELAINE FREEMAN,** | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| **v.** | § | **Civil Action No. 3:22-CV-2909-X** |
| | § | |
| **YOUNG "ANGELO" C. PARK, et al.,** | § | |
| | § | |
| *Defendants*. | § | |

## APPENDIX IN SUPPORT OF PLAINTIFF'S COMBINED MOTION
## <u>IN RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT</u>

Plaintiff Laurelaine Freeman ("***Freeman***") submits this Appendix in Support of Plaintiff's

Combined Motion in Response to Defendants Young "Angelo" Park ("Park"), Knockout Sports

Bar, LLC ("Knockout"), KOSB Addison LLC d/b/a Knockout Sports Bar ("KOSB Addison"), and

KOSB Deep Ellum, LLC d/b/a Knockout Sports Bar's ("KOSB Deep Ellum") Motion for

Summary Judgment (Dkt. 37) and Defendants KOSB Arlington Arena, LLC d/b/a Knockout

Sports Bar and Knockout Sports Arena ("KOSB Arlington Arena"), KOSB Arlington, LLC d/b/a

Knockout Sports Bar ("KOSB Arlington"), KOSB Forth Worth LLC d/b/a Knockout Sports Bar

("KOSB Forth Worth"), and DN – KO The Colony, LLC d/b/a Knockout Sports Bar's ("DN-KO

The Colony") Motion for Summary Judgment (Dkt. 38) which contains the following:

| APP. NO. | DESCRIPTION |
|---|---|
| App. 0001-0007 | Laurelaine Freeman's Declaration |
| App. 0008 | Exhibit 1 – Screenshot of Knockout Website |
| App. 0009 | Exhibit 2 – Freeman 000487 |

| APP. NO. | DESCRIPTION |
|---|---|
| App. 0010-0015 | Laurelaine Freeman's Deposition Excerpts (09-27-2023) |
| App. 0016-0044 | Young "Angelo" Park's Deposition Excerpts (11-15-2023) |
| App. 0045 | Park Deposition Exhibit 3 – Texas SOS Filing History for Knockout Sports Bar, LLC |
| App. 0046 | Park Deposition Exhibit 4 – Texas SOS Filing History for KOSB Deep Ellum, LLC |
| App. 0047 | Park Deposition Exhibit 5 – Texas SOS Filing History for KOSB Arlington, LLC |
| App. 0048 | Park Deposition Exhibit 6 – Texas SOS Filing History for DN-KO The Colony, LLC |
| App. 0053 | Park Deposition Exhibit 7 – Texas SOS Filing History for KOSB Addison LLC |
| App. 0050 | Park Deposition Exhibit 8 – Texas SOS Filing History for KOSB Arlington Arena, LLC |
| App. 0051 | Park Deposition Exhibit 9 – Texas SOS Filing History for Fort Worth LLC |
| App. 0052 | Park Deposition Exhibit 14 – Email from Angelo Park to Laurelaine Freeman (12-14-2021) |
| App. 0053-0080 | Victor Borrego's Deposition Excerpts (08-24-2023) |

Dated: February 2, 2024                     Respectfully submitted,

                                            **CRAWFORD, WISHNEW & LANG PLLC**

                                            _/s/ Camille A. Avant_
                                            **DAVE WISHNEW**
                                            Texas State Bar No. 24052039
                                            dwishnew@cwl.law
                                            **CAMILLE A. AVANT**
                                            Texas State Bar No. 24084397
                                            cavant@cwl.law
                                            **GRACEN DANIEL**
                                            Texas State Bar No. 24116248
                                            gdaniel@cwl.law

                                            1700 Pacific Avenue, Suite 2390
                                            Dallas, Texas 75201
                                            Telephone: (214) 817-4500
                                            Facsimile: (214) 602-6551

                                            _**Counsel for Plaintiff Laurelaine Freeman**_

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was served on all counsel of record via electronic filing on February 2, 2024 in accordance with the FEDERAL RULES OF CIVIL PROCEDURE.

                                            _/s/ Camille A. Avant_
                                            Camille A. Avant

3

DocuSign Envelope ID: C6249CAC-4B08-4443-BA3B-30A157CF78EB

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| **LAURELAINE FREEMAN,** | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| **v.** | § | **Civil Action No. 3:22-CV-2909-X** |
| | § | |
| **YOUNG "ANGELO" C. PARK, et al.,** | § | |
| | § | |
| *Defendants.* | § | |

## <u>DECLARATION OF LAURELAINE FREEMAN</u>

1.　　My name is Laurelaine Freeman. I am over the age of eighteen (18), of sound mind, capable of making this declaration, and have personal knowledge of the facts herein stated, which are all true and correct.

2.　　I am the Plaintiff in this lawsuit. I previously worked for and provided services to or on behalf of Defendants Knockout Sports Bar, LLC ("Knockout"), KOSB Addison LLC d/b/a Knockout Sports Bar ("KOSB Addison"), KOSB Deep Ellum, LLC d/b/a Knockout Sports Bar's ("KOSB Deep Ellum"), KOSB Arlington Arena, LLC d/b/a Knockout Sports Bar, Knockout Sports Arena ("KOSB Arlington Arena"), KOSB Arlington, LLC d/b/a Knockout Sports Bar ("KOSB Arlington"), KOSB Forth Worth LLC d/b/a Knockout Sports Bar ("KOSB Forth Worth"), DN – KO The Colony, LLC d/b/a Knockout Sports Bar's ("DN-KO The Colony") (collectively, "Knockout Defendants"), and Young "Angelo" Park ("Park" collectively with Knockout Defendants as "Defendants").

3.　　To my knowledge, Knockout Defendants are or were managed and controlled by Park, including their operations. During the time I performed services to Knockout Defendants, Park was my direct supervisor and was in control of my hiring, firing, pay, and schedule.

4.      As of January 2020, my titles included Director of Corporate Training, Director of Culinary Development, and Direct of Human Resources. These were my titles at the time of my termination on April 2, 2022.

5.      KOSB Deep Ellum is located at 3825 Pavilion Ct., Mesquite, Texas 75150 and not in Dallas, Texas as the name suggests.

6.      KOSB Arlington was located at 525 S. Riverfront Blvd., Dallas, Texas 75207 and not in Arlington, Texas as the name suggests. I performed the following services for KOSB Arlington including, but not limited to, managerial services, hiring, firing, running the floor, writing company policies, and working directly with Park. KOSB Arlington never paid me for this work.

7.      As of February 1, 2024, KOSB Arlington is still listed on Knockout's public website. Attached hereto as **Exhibit 1** is a true and correct copy of a Screenshot of Knockout's Website taken on February 1, 2024 (App. 8).

8.      I performed the following services for DN-KO The Colony including, but not limited to, training courses, managing labor relations, and filling in for anyone that was out as a general manager, floor manager, or any other position, as needed. DN-KO The Colony never paid me for this work. I performed these tasks through my termination date on April 2, 2022 and took direction from Park.

9.      Between 2018 and April 2022, I received wages from Knockout, KOSB Deep Ellum, KOSB Addison, Angel Management Consulting, LLC, In Fretta Franchising, LLC, and KO Entertainment LLC.

10.     In February 2021, I was managing DN-KO The Colony, Knockout, KOSB Addison, and KOSB Deep Ellum's labor relations with the U.S. Department of Labor relating to employees'

DocuSign Envelope ID: C6249CAC-4B08-4443-BA3B-30A157CF78EB

wages ("Labor Email"). Attached hereto as **Exhibit 2** is a true and correct copy of the Labor Email (App. 9).

11.     I witnessed DN-KO The Colony take advice and recommendations from Park on hiring and firing. I overheard Park tell the owner of DN-KO The Colony that if he did not listen to Park regarding business decisions there would be repercussions. During DN-KO The Colony team meetings, which I participated in, Park emphasized that he had control over DN-KO The Colony— although Alexander Nuguyen was the franchise owner. Park would also place employees that were fired from other KOSB locations at the DN-KO The Colony location.

12.     To my knowledge, DN-KO The Colony is the most successful KOSB entity.

13.     I performed the following services for KOSB Fort Worth starting shortly before I was terminated and continuing through my termination on April 2, 2022, including, but not limited to, discussing potential hires and training with Park as well as marketing.

14.     I, as well as Sang "Gabriel" Han, Harry Kim, and Parker Reynolds, assisted in opening Arlington Arena—although it is not yet open. This work was in addition to my normal job duties. I never received pay for my services and to my knowledge, neither did Sang "Gabriel" Han, Harry Kim, and or Parker Reynolds.

15.     In or around September 2021, Park promised to pay me $10,000 for every KOSB location that I assisted in opening (the "Agreement"). The Agreement, however, did not require KOSB locations to physically open and was not contingent on whether my assistance was satisfactory.

16.     My assistance in opening new facilities was not part of my normal job duties as Director of Corporate Training, Director of Culinary Development, and Director of Human

APP.0003

Resources. Moreover, my understanding was that the Agreement extended to any franchise KOSB location that I assisted in opening.

17.     I believed the Agreement was a mutual promise between Park and me and I relied on Park's promise to pay me $10,000 for every KOSB location that I assisted in opening.

18.     I assisted opening, Knockout Lewisville, Knockout Plano, KOSB Arlington Arena, and KOSB Fort Worth along with Parker Reynolds and Harry Kim. I would not have assisted in performing additional job duties to open these facilities if it were not for Park's promise to pay me $10,000 per location that I assisted in opening. I did not receive $10,000 for each facility I assisted in opening.

19.     Park never complained about my performance or assistance in opening new facilities, he never informed me that my work was unsatisfactory, and the facilities I assisted in opening actually opened, but for Arlington Arena.

20.     In 2018, Park came on to me and I was flattered that a successful restaurant owner would be interested in me.

21.     Between October 8, 2021 through April 2, 2022, Park and I were not in a consensual relationship. I placated Park during this time to keep my job and keep him happy.

22.     My employment with Defendants was contingent on me having sex with Park or engaging in sexual activity with Park. Park would terminate me if I did not perform sexual favors or engage in the sexual activities that he wanted me to.

23.     In mid-2020, I exaggerated a vaginal medical condition to avoid having sex with Park. I did not want to have sex with Park as of 2020. While my medical condition was real, the extent of the condition was fabricated, and I could in fact have sex if I wanted to. Exaggerating my medical condition permitted me to keep my job without having sex with Park because his

4

sexual advances were unwelcome. I, however, was still required to engage in other sexual activity, and he constantly intimidated and/or "love bombed" me to have sex.

24.     After mid-2020 and through my termination on April 2, 2022, Park would ask to grope me in the car in the parking lot of various Knockout Defendants. I would tell Park not to put his hand under my shirt because I did not want Park touching me. I told him that he had to touch me on top of my shirt if he wanted to touch me. I had to engage in some sexual activity to keep my job, but Park's advances were unwelcome.

25.     My impression of Park when I was around him while he was drinking is that Park gets extremely belligerent, aggressive, and verbally and physically abusive to men and women.

26.     From 2020 until my termination on April 2, 2022, Park would yell and berate me alone and in front of others. He would get belligerently drunk and uncontrollable at times to the point I feared that he may physically harm me in his drunken state. Oftentimes we were in an enclosed car together, he would begin yelling and screaming, which heightened my apprehension of his unpredictable behavior.

27.     In or around November 2021, Park berated me in front of others and stated in part, "You do what I say, you stupid bitch," or some variation thereof. Park got in my face, and I feared that he would become physically aggressive.

28.     I also knew that Park kept a gun on him. As the Human Resources Director, an employee of Knockout, Victor Borrego, also complained to me that Park threatened to shoot his son, who was also an employee of Knockout at the time.

29.     On one occasion, I also had to clean up blood after Park got in a fist fight with his brother, Sang "Gabriel" Han. I watched the camera footage after the fight and seeing Park in that light was frightening.

30.     In or around August 2021, Park slept with two (2) Knockout employees. These employees informed me of these encounters as the Human Resources Director. I raised these issues with Park as the Human Resources Director and informed him that he cannot have sex with employees. I was upset with Park because in my opinion as a Human Resources Director, his conduct was improper.

31.     However, I acted as if I was mad at Park for having sex with other women so that he would leave me alone and not try to have sex with me. This bought me about three (3) weeks of Park not sexually harassing me.

32.     In February 2022, Park terminated me because I would not do what he wanted sexually, but he ultimately rehired me.

33.     Park treated me differently because I am American. Park favored his Korean employees, including, but not limited to, Harry Kim, Sang "Gabriel" Han, Jenie (last name unknown), and Jesse Kim, oftentimes talking down on me and my opinions and recommendations in meetings because I am a white blonde American. Park's harassment occurred throughout my employment from 2020 until my termination on April 2, 2022.

34.     Park would call me names like "trashy," stupid white girl," and "American whore."

35.     Park terminated my employment with Knockout Defendants on April 2, 2022. I believe I was terminated because Park wanted to have sex with me, but I refused his advances. Park thought I was having sex with other people after I had told him for months that I had a medical condition that made it painful to have sex. Once Park thought that I was having sex with other people he lost it because I was refusing to have sex with him for so long.

36.     I informed Park on multiple occasions during my employment, that firing me for not having sex with him is unlawful and harassing.

DocuSign Envelope ID: C6249CAC-4B08-4443-BA3B-30A157CF78EB

37.     I did not receive a separate call from KOSB Fort Worth or DN-KO The Colony to let me know that they no longer needed my services after April 2, 2022 as Park controlled my employment with those entities.

38.     To my knowledge, Park is the only individual that has appeared in this lawsuit on behalf of Knockout Defendants. I requested a copy of Defendants engagement agreements and joint defense agreements with Clouse Brown PLLC but they have not been produced in this lawsuit.

39.     I reserve the right to supplement this Declaration if new or additional information becomes available.

I declare under penalty of perjury that the foregoing is true and correct.

Executed in Collin County, State of Texas, on the 2nd day of February 2024.

_____
LAURELAINE FREEMAN

APP.0007



APP.0008

| | |
|---|---|
| **From:** | Laurelaine Iglesias |
| **To:** | laurelainepage@gmail.com |
| **Subject:** | Fwd: FW: Knockout Sports Bar CID: 1906080 |
| **Date:** | Monday, February 22, 2021 12:32:06 PM |

---------- Forwarded message ---------
From: **Laurelaine Iglesias** <laurelainef@kosportsbar.com>
Date: Mon, Feb 22, 2021 at 10:58 AM
Subject: Fwd: FW: Knockout Sports Bar CID: 1906080
To: <laurelainepage@gmail.com>

---------- Forwarded message ---------
From: **Laurelaine Iglesias** <laurelainef@kosportsbar.com>
Date: Thu, Feb 18, 2021 at 2:46 PM
Subject: Re: FW: Knockout Sports Bar CID: 1906080
To: <jessek@kosportsbar.com>
Cc: Andrea Paesano <andreap@kosportsbar.com>, Angelo Park <angelo@kosportsbar.com>,
Yesly Ruiz <yeslyr@kosportsbar.com>, <harryc@kosportsbar.com>

Received thank you!
On Thu, Feb 18, 2021 at 2:45 PM <jessek@kosportsbar.com> wrote:
> Hi Laurelaine,
>
> I hope you had a safe and warm week.
> I am writing to you regards to the Labor department order.
> Please look into the attached WH-46 file and the payment instructions.
> There are former and current employees who need to receive a back wage check. Also, those
> employees work not only Addison. Mix with Colony, NW, and MQ.
> However, those back-wage paychecks will deliver to the Addison location tomorrow around
> 1-2 pm by Yesly. Please announce all of them to pick them up at the Addison.
>
> If you could send back the signed WH-45 form with the missing pay information (who does
> not pick up or has no contact info) to Angelo and me before 3/1, I would really appreciate it.
>
>
> Thank you again.
>
> Best regards,
> Jesse Kim
> Controller
> Knockout Sports Bar
> jessek@kosportsbar.com
> www.kosportsbar.com

1          IN THE UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF TEXAS
2                   DALLAS DIVISION

3   LAURELAINE FREEMAN,          *
                                 *
4          Plaintiff,            *
                                 *        Civil Action No.
5   v.                           *        3:22-CV-2909-X
                                 *
6   YOUNG "ANGELO" C. PARK,      *
    et al,                       *
7                                *
          Defendants.            *
8

9               ********************************

10         ORAL AND VIDEOTAPED DEPOSITION OF
                   LAURELAINE FREEMAN
11                SEPTEMBER 27, 2023

12              ********************************

13      -- PORTIONS OF THIS TRANSCRIPT ARE CONSIDERED --
                   -- CONFIDENTIAL --

14

15      ORAL AND VIDEOTAPED DEPOSITION OF LAURELAINE

16   FREEMAN, produced as a witness at the instance of the

17   Defendants, and duly sworn, was taken in the

18   above-styled and -numbered cause on the 27th day of

19   September, 2023 from 9:16 a.m. to 6:52 p.m., before Leah

20   K. Osteen Dow, CSR in and for the State of Texas,

21   reported by machine shorthand, at the offices of

22   Crawford Wishnew & Lang PLLC, 1700 Pacific Avenue, Suite

23   2390, Dallas, Dallas County, Texas, pursuant to the

24   Federal Rules of Civil Procedure and any agreements

25   stated on the record by counsel.

Laurelaine Freeman  -  9/27/2023

```
 1                  P R O C E E D I N G S
 2                  THE VIDEOGRAPHER:  Going on the record,
 3  Wednesday, September 27th, 2023.  The time is
 4  approximately 9:16 a.m.
 5                  Will the reporter please swear in the
 6  witness.
 7                  (Witness placed under oath.)
 8                  LAURELAINE FREEMAN,
 9  having been first duly sworn to testify to the truth,
10  the whole truth, and nothing but the truth, testified as
11  follows:
12                  EXAMINATION
13  BY MR. LEE:
14      Q.   Please state your full name for the record.
15      A.   Laurelaine Freeman Iglesias.
16      Q.   Ms. Freeman --
17      A.   My maiden name.
18      Q.   Okay.  Iglesias is your maiden name?
19      A.   It's my married name that I never got rid of.
20      Q.   Oh, okay.  Is it all right if I call you
21  Ms. Freeman?  Because that's --
22      A.   That's what I prefer.
23      Q.   -- that's the name that I --
24      A.   That's what I prefer.
25      Q.   -- I hear a lot.
```

Laurelaine Freeman  -  9/27/2023

```
 1      A.    That was Rick's Cabaret.  And also did

 2  deliveries, like Instacart-type stuff, for a couple of

 3  different of those companies.  And it had just gotten so

 4  bad, and I was just -- I mean, I would wake up with

 5  knots in my stomach and just vomit.  And it was every

 6  day, just call after call, all night long.

 7      Q.    Because he would be drunk?

 8      A.    Yeah, and just vicious.  I mean, just

 9  absolutely vicious.

10      Q.    Saying mean things about you, to you?

11      A.    Not just mean things.  Just -- I mean, it

12  was -- it was bad.

13      Q.    You need to explain "bad."  I'm sorry.

14      A.    There would be times, like, going even back to

15  the pandemic one time.  I'll give you times leading up

16  to it.  I agreed to meet him out for dinner, and he had

17  already started drinking a little bit.  And it was a

18  place in Plano.

19            And I explained to him that I didn't have

20  a babysitter all night, just for part of the night, and

21  I couldn't go anywhere with him afterwards.  And he

22  threw a huge scene.  He screamed at me from the parking

23  lot.  The waiter asked if I needed police assistance.

24  Even after he finally drove away, the people at the

25  other restaurant that could hear us from the patio came
```

Laurelaine Freeman  -  9/27/2023

1      A.    Plenty.

2      Q.    Okay.  Tell me about those.  I'm talking about

3   specific threats where he said, "If you do not -- if you

4   don't have sex with me, you don't come in to work

5   tomorrow," or "you're not going to have a job anymore."

6      A.    He used to insist after work that I would meet

7   him in parking lots so that he could grope me in his

8   car.  And he knew I hated it.  He knew it made me feel

9   bad.  He would always insist.

10              I remember one time we were at -- Back 9

11  was one of the places, and I made a fuss about it.  And

12  he got out of the car and caused another parking lot

13  scene.  And he said, "You're fucking gone."  And I said,

14  "We have an agreement, you know, that you're not going

15  to do this again, you're not going to hold my job over

16  my head, because I refuse."  And he said, "Well, then

17  fucking get a lawyer."

18      Q.    When was that?

19      A.    That was -- I'd have to re- -- go through all

20  my messages to figure out which time it was.

21      Q.    And we'll go through --

22      A.    It was in --

23      Q.    You believe it was 2021?  2022?

24      A.    I would think that'd be in 2021.

25      Q.    Okay.  And after that event happened, he

Laurelaine Freeman  -  9/27/2023

```
1              IN THE UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF TEXAS
2                        DALLAS DIVISION

3   LAURELAINE FREEMAN,          *
                                 *
4          Plaintiff,            *
                                 *      Civil Action No.
5   v.                           *      3:22-CV-2909-X
                                 *
6   YOUNG "ANGELO" C. PARK,      *
    et al,                       *
7                                *
           Defendants.           *
8

9         *********************************************
                  REPORTER'S CERTIFICATION
10          ORAL AND VIDEOTAPED DEPOSITION OF
                    LAURELAINE FREEMAN
11                  SEPTEMBER 27, 2023
          *********************************************
12
```

13           I, LEAH K. OSTEEN DOW, Certified Shorthand

14  Reporter in and for the State of Texas, hereby certify

15  to the following:

16           That the witness, LAURELAINE FREEMAN, was duly

17  sworn by me and that the transcript of the oral

18  deposition is a true record of the testimony given by

19  the witness;

20           I further certify that pursuant to FRCP Rule

21  30(f)(1) that the signature of the deponent:

22           _XX__ was requested by the deponent or a party

23  before the completion of the deposition and is to be

24  returned within 30 days from date of receipt of the

25  transcript.  If returned, the attached Errata contain

Laurelaine Freeman  -  9/27/2023

1  any changes and the reasons therefor;

2          _____ was not requested by the deponent or a

3  party before the completion of the deposition.

4          I further certify that I am neither counsel

5  for, related to, nor employed by any of the parties or

6  attorneys to the action in which this proceeding was

7  taken.  Further, I am not a relative or employee of any

8  attorney of record in this cause, nor am I financially

9  or otherwise interested in the outcome of the action.

10          Subscribed and sworn to on this the 27th day

11  of October, 2023.

12

13

14

15
                      _____
16                    LEAH K. OSTEEN DOW, Texas CSR #3916
                      Certification expires:  4/30/2025
17                    Firm Registration No. 392
                      Osteen & Associates Reporting Services
18                    313 Northglen Dr.
                      Hurst, Texas  76054-3024
19                    (817) 498-9990
                      osteenreporting@gmail.com
20

21

22

23

24

25



Deposition of:   Young "Angelo" C. Park

Case:   Laurelaine Freeman v. Young "Angelo" C. Park, et al.

Date:   11/15/2023

Prepared by:

**Elite Deposition Technologies, Inc.**
400 N. Saint Paul Street, Suite 1340
Dallas, TX 75201
866-896-2626
www.elitedeps.com
deps@elitedeps.com

---

```
1                    IN THE UNITED STATES DISTRICT COURT
                    FOR THE NORTHERN DISTRICT OF TEXAS
2                             DALLAS DIVISION

3   LAURELAINE FREEMAN,        )
4               Plaintiff,     )
5   VS.                        )  CIVIL ACTION
                               )
6   YOUNG "ANGELO" C. PARK, et )  NO.: 3:22-CV-2909-X
7   al.,                       )
                               )
8               Defendants.    )

9   ----------------------------------

10       ORAL AND VIDEOTAPED DEPOSITION OF

11            YOUNG "ANGELO" C. PARK

12             NOVEMBER 15, 2023

13   ----------------------------------

14        ORAL AND VIDEOTAPED DEPOSITION OF YOUNG

15   "ANGELO" C. PARK, produced as a witness at the instance

16   of the PLAINTIFF, and duly sworn, was taken in the

17   above-styled and numbered cause on November 15, 2023,

18   from 9:11 a.m. to 6:35 p.m., before Mindy E. Bressert,

19   CSR in and for the State of Texas, reported by machine

20   shorthand, at the law offices of Clouse Brown, PLLC,

21   1201 Elm Street, Dallas, Texas, pursuant to the Federal

22   Rules of Civil Procedure and the provisions stated on

23   the record or attached hereto.

24

25
```

---

```
1                    A P P E A R A N C E S

2   FOR THE PLAINTIFF:

3       Ms. Camille Avant
        Mr. Dave Wishnew
4       CRAWFORD, WISHNEW & LANG PLLC
        1700 Pacific Avenue
5       Suite 2390
        Dallas, Texas 75201
6       Phone: 214.817.4500
        Fax: 214.602.6551
7       cavant@cwl.law

8
    FOR THE DEFENDANTS YOUNG "ANGELO" C. PARK, et al.:
9
        Mr. Robert (Bobby) Lee
10      CLOUSE BROWN PLLC
        1201 Elm Street
11      Suite 5250
        Dallas, Texas 75270
12      Phone:  214.698.5100
        Fax:   214.481.8881
13      Lee@clousebrown.com

14
    ALSO PRESENT:
15
        Mr. Forrest Gunderson, Videographer
16
        Ms. Laurelaine Freeman
17

18

19

20

21

22

23

24

25
```

---

```
1                    I N D E X

2                                               PAGE

3   APPEARANCES.........................................  2

4   STIPULATIONS........................................  6

5   YOUNG "ANGELO" C. PARK
        Examination by MS. AVANT....................  6
6       Examination by MR. LEE...................... 266

7   SIGNATURE AND CHANGES.............................. 270

8   REPORTER'S CERTIFICATE............................. 272

9

10                   E X H I B I T S

11   NO.   DESCRIPTION                             PAGE

12   1     Document titled Certification of
           Criminal History Records Information,
13         Bates stamp FREEMAN_000366.................  21

14   2     Text messages, Bates stamps FREEMAN_000212
           Through FREEMAN_000365.....................  29

15
16   3     Business Organizations Inquiry - View Entry,
           Filing Number: 802801938, Knockout Sports
17         Bar, LLC, Northwest Highway.................  43

18   4     Business Organizations Inquiry - View Entry,
           Filing Number: 80290735, KOSB Deep
19         Ellum, LLC..................................  50

20   5     Business Organizations Inquiry - View Entry,
           Filing Number: 802921543, KOSB
21         Arlington, LLC..............................  62

22   6     Business Organizations Inquiry - View Entry,
           Filing Number: 803021605, DN-KO The
23         Colony, LLC.................................  66

24   7     Business Organizations Inquiry - View Entity,
           Filing Number: 803134407, KOSB
25         Addison, LLC................................  70
```

---

**Page 4**

E X H I B I T S (cont.)

| NO. | DESCRIPTION | PAGE |
|-----|-------------|------|
| 8 | Business Organizations Inquiry - View Entity, Filing Number: 803341044, KOSB Arlington Arena................................. | 73 |
| 9 | Business Organizations Inquiry - View Entity, Filing Number: 804095080, KOSB Forth Worth, LLC...................................... | 91 |
| 10 | Defendant Angelo Park's Responses and Answers to Plaintiff's First Set of Interrogatories.... | 101 |
| 11 | One-page document with expenses listed, first one being 8/17/2019-3/26/21, Car, $7964.40..................................... | 154 |
| 12 | Document titled CA-001_ANGELOPARK_PH, Bates Stamp Park 00035 through 00167.................. | 196 |
| 13 | Email dated October 14, 2019 from Visiting Angel to laurelainepage@gmail.com.  Subject: Fwd:  Incorp Doc for Freeman Consulting, LLC... | 223 |
| 14 | Email dated December 14, 2021 from Visiting Angel to laurelainepage@gmail.com. Subject:  I AM SORRY!  Bates stamp FREEMAN 000560........................... | 225 |
| 15 | Audio Recording............................. | 234 |
|  | (Exhibit Number 15 was marked twice.) | |
| 15 | Letter dated May 13, 2022, from Camille A. Avant to Knockout Sports Bar LLC.  Re:  Ms. Laurelaine Freeman ("Freeman") v. Knockout Sport Bar, LLC ("Knockout") and Mr. Myoung "Angelo" S. Park.  Bates stamp FREEMAN_000386 through FREEMAN_00-394........................ | 246 |
| 16 | Society Insurance Businessowners Policy. Bates stamp Park 00171 through Park 00302................................... | 248 |

---

**Page 5**

E X H I B I T S (cont.)

| NO. | DESCRIPTION | PAGE |
|-----|-------------|------|
| 17 | Chase for Business, PERFBUS CHK (...7336) Knockout Sports Bar, LLC.  Bates stamp Park 00749 through 00752.................... | 252 |
| 18 | Bank of America, Business Adv Relationship - 2385:  Account Activity.  Bates stamp Park 00753 through Park 00756.............. | 253 |
| 19 | Capital One, Laurelaine Iglesias. Bates stamp Park FREEMAN 001034 through FREEMAN 001041.............................. | 256 |
| 20 | Email dated July 3, 2020, from Tom Shuman to Lawrence Ji; Angelo Park; Laurelaine Freeman.  Subject:  Angelo REVISED PO & POF.  Bates stamp FREEMAN 000628............................. | 259 |
| 21 | Capital One, Laurelaine Iglesias.  Bates stamp FREEMAN 001010 through FREEMAN 001017.............................. | 258 |
| 22 | Video clip.................................. | 260 |

---

**Page 6**

P-R-O-C-E-E-D-I-N-G-S

THE VIDEOGRAPHER:  Going on the record. November 15th, 2023.  The time is approximately 9:11 a.m.  The court reporter may now proceed.

(Witness sworn.)

YOUNG "ANGELO" C. PARK, having been first duly sworn, testified as follows:

EXAMINATION

BY MS. AVANT:

Q.  Would you please state your name for the record?

A.  Young C. Park.

Q.  And --

MR. LEE:  Can we put on the record just as it relates to our agreement that we are not going to be going by full objections here, that we'll be limiting it to form, nonresponsive, things of that nature?

MS. AVANT:  Yes, agreed.

MR. LEE:  Okay.

Q.  (BY MS. AVANT)  And what does the C stand for?

A.  Chul, C-h-u-l.

Q.  Have you participated in a deposition before?

A.  Yes.

Q.  How many times?

A.  Three -- three times.

---

**Page 7**

Q.  To what were they related?

A.  It was related to the federal -- two federal cases and one civil case.

Q.  What was the civil case?

A.  It was related to sale and purchase of business litigation.

Q.  Was it related to the sale and purchase of a Knockout location?

A.  No.

Q.  What about the two federal cases, what were those about?

A.  One in 1990 -- late 1990s.  It was -- it was the financial currency collapse-related incident, Wall Street, New York City.

Q.  What was the second one?

A.  It was the IRS audit case.

Q.  Is that a tax fraud case?

A.  It was underreported income case.

Q.  Unreported income?

A.  Under.

Q.  Underreported income?

A.  It was underreported.

Q.  For you personally?

A.  It was business.

Q.  What business was that?

**Page 8**

1    A.  It was the -- the valet -- the wholesale
2  cleaning valet service, hotel cleaning service.
3    Q.  What was the name of that company?
4    A.  Jim Dandy, D-a-n-d-y.
5    Q.  And Jim as --
6    A.  J-i-m.
7    Q.  Do you still own Jim Dandy?
8    A.  No.
9    Q.  Where were you born?
10   A.  South Korea.
11   Q.  Is English your first language?
12   A.  Second.
13   Q.  What's your first language?
14   A.  Korean.
15   Q.  When did you learn to speak English?
16   A.  When I got here, 1980.
17   Q.  Are you fluent in English?
18   A.  I try.
19   Q.  If I ask you a question today and you answer
20  it, is it fair to say that you understood what I asked
21  you?
22   A.  Yes.
23       MR. LEE:  Objection.  Form.
24   Q.  (BY MS. AVANT)  If I ask you a question that
25  you don't understand, will you please ask me to restate

**Page 9**

1  or rephrase my question until you understand it?
2    A.  Yes.
3    Q.  Have you had any alcohol in the last 24 hours?
4    A.  No.
5    Q.  Have you taken any medications that would
6  affect your ability to answer my questions today?
7    A.  No.
8    Q.  Have you taken any medication that would affect
9  your ability to be truthful today?
10   A.  I'm sorry?
11   Q.  Have you taken any medication that would affect
12  your ability to be truthful today?
13   A.  No.
14   Q.  You're doing a good job now.  If we continue,
15  would you please just allow me to answer my question
16  before you give your answer, and I will try my hardest
17  to let you finish your answer before I ask the next
18  question; is that fair?
19   A.  Sure.
20   Q.  Is Young C. Park your birth name?
21   A.  Yes.
22   Q.  Do you also go by Angelo?
23   A.  Yes.
24   Q.  When did you start using the name Angelo?
25   A.  Since I was baptized when I was 8 or 9 years

**Page 10**

1  old.
2    Q.  Is that a name that your mother gave you?
3    A.  No, Catholic Church.
4    Q.  Do you have any other nicknames?
5    A.  Nicknames?
6    Q.  Yes.
7    A.  Donkey.
8    Q.  Okay.  Other than Donkey and Angelo, do you
9  have any other nicknames?
10   A.  Monkey.
11   Q.  Monkey.  Who called you Donkey and Monkey?
12   A.  School.
13   Q.  Were you raised Catholic?
14   A.  Yes.
15   Q.  Have you gone by any other names during your
16  lifetime?
17   A.  No, ma'am.
18   Q.  Has anyone been present when you meet with your
19  attorneys other than your attorneys?
20       MR. LEE:  What are you talking about?
21   A.  No, ma'am.
22       MR. LEE:  Hold on.  Under what
23  circumstances do you mean?
24       MS. AVANT:  At any point in time.
25   Q.  (BY MS. AVANT)  Is the answer no?

**Page 11**

1    A.  No.  Just --
2    Q.  Just you and the attorney?
3    A.  Yes.
4    Q.  Have you ever been told that you're physically
5  abusive by anyone?
6    A.  No.
7    Q.  Have you ever been told that you're mentally
8  abusive by anyone?
9    A.  No, ma'am.
10   Q.  Have you been called a narcissist?
11   A.  No.
12   Q.  Have you ever been told that you're
13  manipulative?
14   A.  No.
15   Q.  Have you ever been accused of raping anyone?
16   A.  No.
17   Q.  And have you ever been accused of sexual
18  assault?
19   A.  No.
20   Q.  Have you ever been arrested?
21   A.  Yes.
22   Q.  How many times?
23   A.  Four times.
24   Q.  The four times you were arrested, can you list
25  off what caused the arrest?

```
 1        A.  Three to four years.
 2        Q.  When you were living on Trinity Mills, where
 3   was your wife living?
 4        A.  Her own place.
 5        Q.  Do you know the address of where she was
 6   living?
 7        A.  Yes, 8600 Douglas Avenue.
 8        Q.  That's Dallas?
 9        A.  Dallas.
10        Q.  At what point in time did you and your wife
11   live under the same roof?
12        A.  We have the arrangement for quite some time.
13   We don't ever want to hurt our children with divorce.
14   That happened to me.  I couldn't study.  The world came
15   apart.  So we -- we put up a facade for our children
16   until they get out of college.  So we -- we acted as
17   though we are together, but then we weren't together.
18        Q.  Sky went to college about a year ago?
19        A.  Yes.  This is first year in college.
20        Q.  And so up until about a year ago, you and your
21   wife lived together?
22        A.  We had two houses, but when the children are at
23   home, I'm home in a different room and she's upstairs,
24   but then I go away to my place.  So it was -- it was
25   together living apart, something like that.
```

```
 1        Q.  So you guys didn't actually sleep in the same
 2   house?
 3        A.  I don't remember the last time.
 4        Q.  It's been many years?
 5        A.  Yes, ma'am.
 6        Q.  Over five years?
 7        A.  Yes.
 8        Q.  Is your wife aware that you are part of this
 9   lawsuit?
10        A.  Yes.
11        Q.  And she's aware of the accusations that are
12   made in the lawsuit?
13        A.  Very well.
14        Q.  That has nothing to do with the fact that you
15   guys aren't living together, the accusations made in
16   this lawsuit?
17        A.  No, ma'am.
18        Q.  What's your current cell phone number?
19        A.  214-422-8804.
20        Q.  How long have you had that phone number?
21        A.  Five, six years.
22        Q.  Do you have any other cell phone numbers?
23        A.  No, ma'am.
24        Q.  When was the first Knockout Sports Bar formed?
25        A.  Formed or opened?
```

```
 1        Q.  Formed.
 2        A.  Sometime in 2017.
 3        Q.  August 2017, does that sound right?
 4        A.  Probably, yes.
 5        Q.  And then when did the first Knockout actually
 6   open?
 7        A.  March 2018.
 8        Q.  Where was the first Knockout location?
 9        A.  Northwest Highway.
10        Q.  That's the Northwest Highway location that you
11   recently received a DWI driving from, correct?
12        A.  Correct.
13        Q.  And I'm going to refer to that as the Northwest
14   Highway location.
15        A.  Yes.
16        Q.  Are you the owner of the Northwest Highway
17   location?
18        A.  Yes and no.  Yes because I own a fraction.  No
19   because I -- I'm a manager legally.  I'm the manager of
20   the business.  In terms of the LLC formation, I'm the
21   manager of the LLC so --
22        Q.  What part of the fraction do -- strike that.
23            What fraction of Knockout do you own?
24        A.  Northwest Highway?
25        Q.  Yes, of Northwest Highway.
```

```
 1        A.  I'm confused, but I think I own half a percent
 2   or -- or .025.  It's either half a percent or a quarter
 3   percent.
 4        Q.  Who are the other owners of the Northwest
 5   Highway location?
 6        A.  One EB-5 investor.
 7        Q.  Who owns how much?
 8        A.  The investor from Vietnam owns 99.5.
 9        Q.  They own the remaining percent?
10        A.  Yes.
11        Q.  Does anyone else own a percentage of the
12   Northwest Highway location?
13        A.  A lawyer who put together EB-5s owns the same
14   fraction that I own equally, so it could be .05 or .025.
15        Q.  Is that an attorney that lives in the United
16   States?
17        A.  Yes.
18        Q.  What's that attorney's name?
19        A.  Tim Knowles, K-n-o-w-l-e-s.  Tim Knowles.
20            (Clarification by reporter.)
21        Q.  (BY MS. AVANT)  You also said that you are
22   legally the manager of the Northwest Highway location.
23        A.  I have -- that's how it's arranged.  I have to
24   -- I have to be the manager because they cannot manage.
25        Q.  The investigator can't manage himself or
```

APP.0019

```
 1   itself?
 2       A.  They couldn't be here in the beginning.  They
 3   have to wait.  It's the investment for green card
 4   program.
 5       Q.  How much did the EB-5 investor invest into the
 6   Northwest Highway location?
 7       A.  Half a million.
 8       Q.  And when did they invest that?
 9       A.  2018.
10       Q.  When it was opening?
11       A.  Uh-huh.
12       Q.  Have you received any profits or distributions
13   from the Northwest Highway location?
14       A.  I receive fees.  It's called royalty, but not
15   directly from the profit, just the royalty based on the
16   agreement that we had.
17       Q.  Do you get monthly royalties?
18       A.  Yes.
19       Q.  What's your monthly royalty fee?
20       A.  Used to be five percent of the sales, but not
21   anymore.
22       Q.  What is it now?
23       A.  We don't collect anymore.
24       Q.  Okay.  When did you stop collecting five
25   percent of the sales?
```

```
 1       A.  It stopped when it became unprofitable, could
 2   not pay the bills, so I forgave a while back.
 3       Q.  Do you remember the year?
 4       A.  I couldn't do that during pandemic.  After
 5   pandemic, it started to really underperform, so the --
 6   the royalty income dwindled to -- to nothing within
 7   about a year since we reopened.
 8       Q.  So sometime in 2021-2022?
 9       A.  Yeah.
10       Q.  When did you guys reopen after the pandemic?
11       A.  Yeah, whenever we could.
12       Q.  Do you know a month?
13       A.  They let us open and they shut us down again,
14   so permanently we opened about September 2020.
15           (Clarification by reporter.)
16       Q.  (BY MS. AVANT)  Other than the manager, do you
17   hold any other position at the Northwest Highway
18   location?
19       A.  No.
20       Q.  Do you receive a salary from the Northwest
21   Highway location?
22       A.  No.
23       Q.  Do --
24       A.  Okay.  When the government gave us the
25   grants -- I forget the name.
```

```
 1       Q.  The PPO loan?
 2       A.  I think so.  It's a non-recourse, correct, that
 3   you don't have to pay back.  Free money that the
 4   business got.  It had to prove the money had to spend on
 5   the employees, so I got on the payroll for the first
 6   time for some time.
 7       Q.  So that was sometime in 2020?
 8       A.  Yes.  2021, yeah.
 9       Q.  Until how long were you on the payroll?
10       A.  Three or -- three to four month.
11       Q.  And how much were you receiving?
12       A.  Money, you know, didn't last.  Probably a
13   thousand dollars a week.
14       Q.  For three to four months?
15       A.  (Indicating.)
16       Q.  Other than you receiving money through the loan
17   assistance program and the royalty at five percent of
18   sales, have you received any other money from the
19   Northwest Highway location?
20       A.  No.
21           MR. LEE:  At any point time?
22           MS. AVANT:  Yes, at any point in time.
23       A.  No.  That's the only source of income for us,
24   the royalty.
25           MR. LEE:  Before you go on to another
```

```
 1   question, if you want to finish this round, that's fine.
 2   I'd like to --
 3           MS. AVANT:  You want to take a break?
 4   Okay.  Let me just finish this and then we can take a
 5   break.
 6           MR. LEE:  Okay.
 7       Q.  (BY MS. AVANT)  Who is Myoung S. Park?
 8       A.  My mother.
 9       Q.  Is she currently alive?
10       A.  Yes.
11       Q.  How old is she?
12       A.  Okay.  80 -- 84.
13       Q.  Where does she live?
14       A.  With me.  With me.
15       Q.  At the Old Denton house?
16       A.  Yes, ma'am.
17       Q.  Is she aware that the Northwest Highway
18   location is part of a lawsuit?
19       A.  No.
20       Q.  Does she have any management role of the
21   Northwest Highway location?
22       A.  No.  She is on the paper, but she doesn't run
23   it.
24           (Deposition Exhibit 3 marked for
25           identification.)
```

1    Q.  (BY MS. AVANT)  I'm going to show you what is
2  marked as Exhibit 3.
3           MR. LEE:  I'll put this one over here.
4           MS. AVANT:  Oh, I'm sorry.
5    Q.  (BY MS. AVANT)  Is this the Knockout Sports Bar
6  Northwest Highway location that we've been referring to?
7    A.  Yes.
8    Q.  And it says the original date of filing,
9  August 28, 2017; is that when it was formed?
10   A.  Yes.
11   Q.  And then if you look, it says that the
12 management of this, the Myoung -- Myoung S. Park is the
13 managing member and also the director.  Do you see that
14 there?
15   A.  Yes.
16   Q.  Is this accurate?
17   A.  She and I discussed it and she, you know, is on
18 the books, but I ran the business.
19   Q.  What's her involvement in the Northwest Highway
20 location?
21   A.  Registered agent, like member.
22   Q.  Does she do anything on the day-to-day
23 operations of the Northwest Highway location?
24   A.  No, ma'am.
25   Q.  Why are you not listed as a manager or member

---

1  of the Northwest Highway location?
2    A.  It was -- one of the reasons is that we have to
3  diversify.  You know, it's a high risk business, you
4  know, alcohol involved, so you don't put your name on
5  everywhere, so we diversify.  So she's here for that
6  reason, just so that we shield the integrity of the
7  business by not overly concentrating on one person.
8    Q.  You didn't want to publicly put your name as a
9  member or manager of the Northwest Highway location?
10   A.  No.  No, not at that point.
11   Q.  At any point, correct?
12   A.  No, my name is some other places.
13        (Clarification by reporter.)
14   A.  My name is other places, too, but we don't want
15 to put one name everywhere because of the nature of the
16 business.
17   Q.  (BY MS. AVANT)  Has she received any income
18 from the Northwest Highway location?
19   A.  No, ma'am.
20   Q.  Ever?
21   A.  No.
22   Q.  Do you not put your name on the secretary of
23 state filings because of your criminal record?
24   A.  I could be in any company, even with that.  It
25 was not because of that.  That's -- in other words, I am

---

1  allowed, able to run business in America even with my
2  federal criminal record, so that's not the reason.
3    Q.  Okay.  You don't want people to be able to
4  search for Northwest Highway and find your name
5  associated with it, correct?
6    A.  That's not the reason that I don't want them to
7  find me.  It's not the reason.  It's -- it's really
8  business decision.
9    Q.  To not have your name publicly listed as the
10 manager despite --
11   A.  Not in --
12   Q.  -- that you were managing?
13   A.  To not put my name everywhere.
14   Q.  Where is your name located for the Northwest
15 Highway location?
16   A.  Other LLCs.  I have other LLCs.
17   Q.  So for the Northwest Highway location, where is
18 your name referenced?
19   A.  No.  Nowhere.
20   Q.  Nowhere?  And then this 2560 Royal Lane 202,
21 what address is that?
22   A.  That is -- oh, that's the attorney's office,
23 the filing attorney's office.
24   Q.  That's the Tim Knowles?
25   A.  No, ma'am.

---

1    Q.  That's a different attorney?
2    A.  Yes.
3    Q.  Do you know what attorney office this is?
4    A.  Patrick Lee, L-e-e.
5    Q.  L-e-e?
6    A.  (Indicating.)
7         MR. LEE:  A good Korean name.
8    A.  Like Bruce Lee.
9         MS. AVANT:  Okay.  We can take a break.
10        THE VIDEOGRAPHER:  Going off the record
11 10:11 a.m.
12        (Break taken from 10:11 a.m. to 10:28 a.m.)
13        THE VIDEOGRAPHER:  Going on the record,
14 10:28 a.m.
15        MR. LEE:  Angelo, you want to say something
16 related to the questions that were asked earlier about
17 the Northwest Highway location?
18        THE WITNESS:  Oh, yes.  I forgot, or maybe
19 I didn't properly answer your question about who owns
20 Northwest Highway currently.
21        MS. AVANT:  Uh-huh.
22        THE WITNESS:  It's been sold to a -- other
23 people.  We just could not keep up with the losses so we
24 sort of -- sort of gave it away at a deep discount back
25 in -- it's been three -- three month.

1    Q.  (BY MS. AVANT)  In August?  You sold it in
2  August?
3    A.  About, yes, ma'am, three month, July, August.
4    Q.  How much did you sell it for?
5    A.  $300,000.
6    Q.  Who did you sell it to?
7    A.  To a gentleman named Manny.  He goes by Manny,
8  and him and his family.
9    Q.  Do you know Manny's legal name?
10   A.  No.
11   Q.  Do you know his last name?
12   A.  No, but it's -- it's -- I could find it, but he
13  did not use his name.  He used -- he used, I think, his
14  wife's name, I believe.
15   Q.  Do you know his wife's name?
16   A.  Veronica something.  I'll find the last name.
17   Q.  Why have you not notified the secretary of
18  state that you sold Northwest Highway and your mom is no
19  longer the manager/director?
20   A.  I -- so when you sell businesses with liquor
21  license attached to it, normally the process is such
22  that you -- the seller becomes the manager for the
23  duration for them to get a new liquor license.  So they
24  just got their liquor license, I believe, and we
25  surrendering our TABC license this week, so there's a

---

1  process.
2    Q.  Does your mother know you sold the Northwest
3  Highway location and she is currently listed as the
4  manager/director while the sellers get their liquor
5  license?
6    A.  Yes.
7        MR. LEE:  Objection.  Form.
8    A.  Yeah, she knows.
9    Q.  (BY MS. AVANT)  Where did you put the $300,000
10  that you received?
11   A.  It had to go back into the operating account of
12  the business to pay the -- the accrued expenses of 30 to
13  90 days.
14   Q.  So you put the money into other Knockout
15  entities?
16   A.  No, ma'am.  The money goes into the Northwest
17  Highway bank account to pay its bills.
18   Q.  Did you walk away with any cash from that sale?
19   A.  I did not.
20   Q.  The whole 300,000 went into the expenses and
21  bills of the Northwest Highway location?
22   A.  Yes.
23   Q.  Was there a loss when you sold it?
24   A.  I mean there -- pretty bad, yeah.
25   Q.  About how bad?

---

1    A.  Over the years it's -- it's on the tax return,
2  but if I can recollect correctly, easily, you know,
3  couple hundred thousand dollars a year for the past
4  couple of years.
5    Q.  And it's your testimony that you have not
6  lowered your sales revenue to create that hundred
7  thousand dollars of loss for Northwest Highway?
8    A.  Yeah.  We never done that.  I know that I did
9  once in New York, may -- may implicate me again, but no.
10  Knockout is a franchise business.  It's a federally
11  traded -- federally-registered company.  We don't have
12  a -- a -- you know, those -- what is it -- analog cash
13  register.  It's all wired POS system.  Every sale enters
14  into the system, and we -- we report 100 percent of the
15  sales so that our company can earn the true five percent
16  of the sales.
17        MR. LEE:  Objection.  Nonresponsive.
18   Q.  (BY MS. AVANT)  The Deep Ellum location was the
19  next location that you opened?
20   A.  Yes.
21        (Deposition Exhibit 4 marked for
22         identification.)
23   Q.  (BY MS. AVANT)  I'm going to show you what is
24  marked as Exhibit 4.  Is 11445 Emerald Street, Suite
25  112, Dallas, Texas 75229, the address of the Deep Ellum

---

1  location?
2    A.  Yes.
3    Q.  Are you the owner of the Deep Ellum location?
4    A.  It's the same structure as the Northwest
5  Highway.  I own that fraction.
6    Q.  What percentage do you own of the Deep Ellum
7  location?
8    A.  Again, .05 or point -- I'm sorry, half a
9  percent or the quarter percent.
10   Q.  Who owns the remaining percentage of the Deep
11  Ellum location?
12   A.  Tim Knowles owns what I own, the fraction, and
13  two EB-5 investors own the rest.
14   Q.  Where are the EB-5 investors located?
15   A.  One in Vietnam and the other just got to the
16  America -- to the --
17   Q.  To the states?
18   A.  To the states, in Texas.
19   Q.  The EB-5 investor in Vietnam, how much did it
20  invest into the Deep Ellum location?
21   A.  Half a million.
22   Q.  How much did the U.S. investor invest into the
23  Deep Ellum location?
24   A.  Half a million.
25   Q.  Have you received any profits or distributions

1  from the Deep Ellum location?
2      A.  No, ma'am.
3      Q.  None?
4      A.  Just the royalty.
5      Q.  Just the royalty.  What is your royalty
6  percentage that you get from the Deep Ellum location?
7      A.  Same.  Five percent of the sales.
8      Q.  And that is a monthly royalty payment?
9      A.  Yes.
10     Q.  Are you still receiving five percent of the
11 sales today?
12     A.  No, ma'am.
13     Q.  When did you stop receiving five percent of the
14 sales?
15     A.  Again, nothing during the pandemic and then
16 slowly we try to collect, but I don't remember exactly,
17 but we could not get the money regularly in its
18 entirety, so as the business went down, my application
19 is in to plug the losses.  So business loses money, I
20 don't have a chance to collect royalty.  Instead, I have
21 to put money into the business to plug the losses, so
22 that's the structure.  So we just couldn't collect the
23 monies as soon as business turned sour.
24     Q.  And do you remember when that was?
25     A.  Started 2021 till now.

1          MS. AVANT:  Okay.  Let's take a break.
2          THE VIDEOGRAPHER:  Going off the record.
3  10:38 a.m.
4          (Break taken from 10:38 a.m. to 11:03 a.m.)
5          THE VIDEOGRAPHER:  Going on the record.
6  11:03 a.m.
7      Q.  (BY MS. AVANT)  Okay.  Mr. Park, before we got
8  off the record we were talking about Exhibit 4, the Deep
9  Ellum location.  And you stated that you stopped
10 receiving five percent of monthly sales around 2021; is
11 that accurate?
12     A.  Yes.
13     Q.  And you have not received any type of royalty
14 from the Deep Ellum location since 2021?
15     A.  I must say, if we collected maybe one month
16 worth or two month worth out of the whole year, so it
17 was really bad, so we do what we can.  Yeah.
18     Q.  So there may have been some months after 2021
19 that you did --
20     A.  Yeah.
21     Q.  -- receive some royalty payment?
22     A.  But they're never five percent, maybe.
23 Whatever we could collect.
24     Q.  Have you received any type of income or salary
25 from the Deep Ellum location?

1      A.  Yes.  Same as Northwest Highway.  When the
2  government check came in, everybody had to be on the
3  payroll to spend that money.
4      Q.  Were you also receiving a thousand dollars a
5  week at that time?
6      A.  About, yeah.
7      Q.  And was that also for three to four months?
8      A.  Probably, yes.
9      Q.  What's your position at the Deep Ellum
10 location?
11     A.  Manager.
12     Q.  And as the manager of the Deep Ellum location,
13 what are your responsibilities?
14     A.  Day-to-day operation.
15     Q.  Do you hold any other position at the Deep
16 Ellum location?
17     A.  Okay.  I do remember that legally I am a
18 general partner correctly.  General partner is my
19 legal -- it is a partnership structure.  I'm a general
20 partner for Northwest Highway and Deep Ellum.
21     Q.  So you're also a general partner for the
22 Northwest Highway location?
23     A.  Yes.
24          MR. LEE:  Was.
25     A.  Northwest Highway location, I was.  Deep Ellum,

1  I am.
2      Q.  (BY MS. AVANT)  Okay.  When you were a general
3  partner for the Northwest Highway location, who were the
4  other partners?
5      A.  Tim Knowles.
6      Q.  Anyone else?
7      A.  And then the -- the EB-5 investors are limited
8  partners.
9      Q.  They're limited partners?
10     A.  Yeah.
11     Q.  How many limited partners did the EB-5
12 investors have?
13     A.  There was one for Northwest Highway.
14     Q.  But the Deep Ellum location, who are your other
15 partners?
16     A.  The two EB-5 investors were limited partners.
17     Q.  And how many limited partners do those two EB-5
18 investors have?
19     A.  I'm sorry?
20     Q.  How many limited partners do those two EB-5
21 investors have?
22     A.  Just two.
23     Q.  Just two.  Is Tim Knowles also a partner of the
24 Deep Ellum location?
25     A.  General partner, yes.

1   A.  Not yet.

2   Q.  Are you in the works of trying to sell the Deep

3  Ellum location?

4   A.  I -- I think it'll have to be sold because it's

5  not making money, yeah.

6   Q.  It's operating at a loss right now?

7   A.  Yes.

8   Q.  Have you had conversations with any sellers to

9  sell the Deep Ellum location?

10   A.  Not yet.

11   Q.  The next location that you opened is KOSB

12  Arlington; does that sound right?

13   A.  Yes.

14   Q.  Are you an owner of KSOB [sic] Arlington?

15   A.  No, ma'am.

16   Q.  No?

17   A.  No.

18   Q.  Who owns KSOB Arlington?

19   A.  Same structure.  I own the fraction with Tim

20  Knowles, and EB-5 investors own the restaurant.

21   Q.  Is it the same quarter to half a percent?

22   A.  Yes.

23   Q.  For both you and Mr. Knowles?

24   A.  Yes.

25   Q.  Is it one EB-5 investor that owns the remaining

---

1  percentage?

2   A.  At the time, two.

3   Q.  And is that one in Vietnam and one in the U.S.?

4   A.  No, different people in Vietnam.

5   Q.  So two different EB-5 investors in Vietnam?

6   A.  Yes.

7   Q.  Have you ever owned a larger percent than a

8  quarter to half a percent of either the KSOB Arlington,

9  Deep Ellum or Northwest Highway location?

10   A.  No, ma'am.

11   Q.  It's always been a quarter to .5 percent?

12   A.  Yes.

13   Q.  Do you receive any profits or distributions

14  from the Arlington location?

15   A.  That location had to be closed down during

16  pandemic and we just couldn't open back.

17   Q.  Prior to you closing it during the pandemic,

18  did you receive any profits or distributions?

19   A.  Only the royalties of five percent.

20   Q.  So the same as Deep Ellum and Northwest

21  Highway, you received five percent of sales?

22   A.  Yes.

23   Q.  Did you ever receive greater than five percent

24  of sales?

25   A.  No.

---

1   Q.  Did you receive a salary from the Arlington

2  location?

3   A.  No.

4   Q.  And you didn't receive the loan assistance

5  program --

6   A.  No.

7   Q.  -- money during COVID?

8   A.  It didn't have the qualifications.

9   Q.  So the Arlington location closed in 2020?

10   A.  Yes.

11         (Deposition Exhibit 5 marked for

12          identification.)

13   Q.  (BY MS. AVANT)  I'm going to show you what's

14  marked as Exhibit 5, and if you will look at Exhibit 5

15  it says KOSOB Arlington was originally filed

16  January 30th of 2018; that sounds accurate?

17   A.  Yes.

18   Q.  And if we look here, it again says your mother,

19  Myoung Park, is the manager of this entity; is that

20  accurate?

21   A.  Yes.

22   Q.  Has she performed any managerial duties for the

23  Arlington location?

24   A.  No.

25   Q.  Why do you have her listed as the manager on

---

1  Texas SOS if she's not performing managerial duties?

2   A.  For the -- again, same reason, for the risk

3  diversification, and she agreed to be manager while I

4  was a managing partner.

5   Q.  Has Myoung Park received any compensation,

6  whether it be royalty, salary or any payment, related to

7  the Arlington entity?

8   A.  No, ma'am.

9   Q.  The next entity that was opened is DN-KO The

10  Colony; is that correct?

11   A.  Yes.

12   Q.  That was also in 2018?

13   A.  I believe so, yeah.

14   Q.  Do you have an ownership percentage in DN-KO

15  The Colony?

16   A.  No, ma'am.

17   Q.  Who owns DN-KO The Colony?

18   A.  The franchisee.

19   Q.  Who are the franchisees?

20   A.  Alex Nuguyen, and the other gentleman I --

21  could be Michael something.

22   Q.  Michael Dinh?

23   A.  Yes.

24   Q.  D-i-n-h?

25   A.  Yes.

1    Q.  Have you ever had an ownership percentage in
2 DN-KO The Colony?
3    A.  No, ma'am.
4    Q.  Do you own the building that -- strike that.
5        Do you own the property for DN-KO The
6 Colony, for that location?
7    A.  No, ma'am.
8    Q.  Do you own the building?
9    A.  No, ma'am.
10    Q.  Have you ever owned the property or the
11 building for the DN-KO The Colony?
12    A.  Never.
13    Q.  Do you receive any profits or distributions
14 from The Colony location?
15    A.  Just the royalty of five percent.
16    Q.  How do you received the royalty of five percent
17 for The Colony location if you were not the owner?
18    A.  Because I'm the franchisor.  They are the
19 franchisee, and they signed the franchise agreement.
20    Q.  So they signed an agreement with you and part
21 of that agreement you retained five percent of sales?
22    A.  Not retained, collect, if they agree to pay
23 because they could -- they could stop paying if I don't
24 help them.  So it's a -- it's a mutual relationship.  I
25 have to help them so that I can collect, and they have

1 to be profitable so I can collect, so it's in my best
2 interest for them to succeed.
3    Q.  So you help them with the operations and the
4 management of The Colony location, and in return you
5 receive five percent of sales if they are profitable?
6    A.  Yes.
7        MR. LEE:  Objection.  Form.
8    A.  As much as I can, yes.
9    Q.  (BY MS. AVANT)  Do you help them staff that
10 location with employees?
11    A.  No, ma'am.
12    Q.  What -- how do you help them with operations?
13    A.  From the -- from the, you know, finding the
14 location, negotiating lease, and negotiating vendors, to
15 purchasing FF&Es, and then training the -- the owners
16 and their management.
17    Q.  Do you have any type of position or title at
18 The Colony location?
19    A.  No, ma'am.
20    Q.  Do you receive any type of base salary at The
21 Colony location?
22    A.  No.
23    Q.  Do you receive any other form of compensation
24 other than the royalty fee?
25    A.  No.

1        (Deposition Exhibit 6 marked for
2             identification.)
3    Q.  (BY MS. AVANT)  I'll show you what's marked as
4 Exhibit 6.  It says the filing date was May 21st, 2018,
5 at The Colony location.  Does that seem accurate?
6    A.  Yes.
7    Q.  Tell me the circumstances surrounding the
8 franchisees opening The Colony location in 2018; how did
9 that come about?
10    A.  Alex and Michael, friends of friends, they came
11 to visit Northwest Highway.  We were doing good in the
12 beginning and they were impressed, and they wanted to
13 open one in Frisco initially but couldn't find a spot.
14 So we hire a broker to find the -- best location for
15 them.  Came across this particular spot and they -- they
16 just love that location and signed up with us to open
17 Knockout there.
18    Q.  Other than executing the agreement in which
19 they agreed to give you five percent of royalties if
20 there was a profit, did they give you any other type of
21 compensation in 2018?
22    A.  No other -- anything else, nothing outside the
23 agreement, no.
24    Q.  And Alex Nuguyen, you said that is your
25 personal friend?

1    A.  No.  A friend -- I believe he's -- he was
2 introduced to me by my brother, yeah.
3    Q.  Same with Michael Dinh?
4    A.  I think so, yeah.
5    Q.  Are they also Korean?
6    A.  They are Vietnamese.
7    Q.  Vietnamese?
8    A.  American.
9    Q.  The next entity that was opened is KOSOB [sic]
10 Addison?
11    A.  Yes.
12    Q.  What's your ownership percentage of the Addison
13 location?
14    A.  Personally, I owned 30 percent.
15    Q.  Who owns the other 70 percent?
16    A.  The Colony franchisee, the company DN-KO The
17 Colony owned 30.  And another company, I forget the
18 name, own 10 percent.  And then Tim Knowles own 10
19 percent.  And then my mother own 10 percent, my brother
20 own 10 percent, and I own the rest, 30 percent.
21    Q.  Do you know the name of the other company that
22 owns the ten percent?
23    A.  Okay.  Something Redevelopment.  Something
24 Redevelopment.
25    Q.  Do you have any ownership in the Redevelopment

**Page 68**

1    company that owns ten percent?

2        A.   No, ma'am.

3        Q.   Is the KOSOB Addison location your most

4    profitable location through the years?

5        A.   It was -- it was one of the best, along with

6    The Colony.

7        Q.   Do you receive profits and distributions from

8    the Addison location?

9        A.   Yes.

10       Q.   Do you know how much in profits and

11   distributions you received last year for the Addison

12   location?

13       A.   We did not receive profit last year.  We lost

14   money last year.

15       Q.   What about 2021, did you receive any profits

16   and distributions for the Addison location?

17       A.   '21 we turned some profits, yes.

18       Q.   And how much did you walk away with in profits

19   and distributions for 2021?

20       A.   I -- I don't have the exact numbers but '21,

21   company might have made $200,000 that year.

22       Q.   200,000?

23       A.   About, yeah, but I could be wrong about that

24   200,000.

25       Q.   What about 2020?

---

**Page 69**

1        A.   Lost money.

2        Q.   And then 2019 pre-COVID, do you know how much

3    profit was?

4        A.   It was profitable in 2019.

5        Q.   Do you know the dollar figure approximately?

6        A.   I would like to say about quarter million.

7        Q.   Do you receive a salary from the Addison

8    location?

9        A.   No.

10       Q.   What's your position, if you have one?

11       A.   I was a managing partner of the -- of

12   the company.

13       Q.   Who were the other managing partners?

14       A.   I -- I think I was the only one.

15       Q.   For the Addison location?

16       A.   I believe so, yes.

17       Q.   During COVID, you didn't receive the government

18   assistance for the Addison location?

19       A.   Yes, it did get government grants, and we were

20   on the payroll for some time.

21       Q.   Did you receive a thousand dollars a month

22   approximately?

23       A.   Yes, I think so.

24       Q.   For approximately three to four months?

25       A.   About, yes.

---

**Page 70**

1        Q.   And I forgot to ask for The Colony location.

2    Did you also receive the government assistance during

3    COVID at The Colony location?

4        A.   No, that's not my store so I -- even if they

5    did, I didn't.

6        Q.   You didn't receive any?

7        A.   No.

8                 (Deposition Exhibit 7 marked for

9                  identification.)

10       Q.   (BY MS. AVANT)  I'm handing you what's been

11   marked as Exhibit 7.  On here it states that the Addison

12   location was formed on October 4th of 2018.  Does that

13   sound accurate?

14       A.   Yes.

15       Q.   And again it lists your mother, Myoung Park, as

16   the manager and director.  Is that accurate?

17       A.   Yes.

18       Q.   Does she have any type of managerial role of

19   the Addison location?

20       A.   No.

21       Q.   Does she have any type of director role at the

22   Addison location?

23       A.   No.

24       Q.   Does she do any type of operations for the

25   Addison location?

---

**Page 71**

1        A.   No, she doesn't.

2        Q.   Does she draw a salary at the Addison location?

3        A.   No.

4        Q.   The only thing that -- or strike that.

5                 Does she receive profits and distributions

6    for the Addison location?

7        A.   Yes.

8        Q.   Ten percent?

9        A.   Yes.

10       Q.   Why are you not listed as a manager or director

11   on the Texas Secretary of State website for the Addison

12   location?

13       A.   For the same reason.

14       Q.   The same reason being you want to diversify

15   things and for protection?

16       A.   Yes.

17       Q.   Is that personal liability protection?

18              MR. LEE:  Objection.  Form.

19       A.   It could be -- it could be many protections.

20       Q.   (BY MS. AVANT)  Does that include personal

21   liability?

22       A.   I believe so.  Yeah.

23       Q.   The next entity that was created was the KOSOB

24   Arlington Arena [sic]; does that sound accurate?

25       A.   Yes.

1    Q.  That was formed in 2019?

2    A.  Yes.

3    Q.  What is your ownership percentage -- strike

4  that.

5         What's the difference between the Arlington

6  Arena location and KOSOB Arlington which we looked at,

7  which is Exhibit Number 5?

8         MR. LEE:  Objection.  Form.

9    A.  I can answer that?

10        MR. LEE:  Yeah.  If you understand the

11 question, answer.

12   A.  Yeah.  KOSB Arlington is the one in downtown

13 Dallas, and KOSB Arlington Arena is the Arlington

14 location.  The names are confusing.

15   Q.  (BY MS. AVANT)  Okay.  So they are actually in

16 two different locations?

17   A.  Yes.

18   Q.  And the KOSOB Arlington, which is Exhibit 5, is

19 actually located in Dallas?

20   A.  Yes.

21   Q.  And the KOSOB Arlington Arena is actually

22 located in Arlington?

23   A.  Yes.

24   Q.  What's the address for the Arlington Arena

25 location?

1    A.  1520 Nolan Ryan Expressway, Arlington, Texas.

2         (Deposition Exhibit 8 marked for

3          identification.)

4    Q.  (BY MS. AVANT)  I'm going to show you what's

5  been marked as Exhibit 8.  Can you tell me why the

6  address listed on the Texas Secretary of State website

7  is your attorney's address on Royal Lane?

8    A.  He is the filing attorney for many of Knockout

9  units.

10   Q.  Do you know why his address is listed as the

11 Arlington Arena address and not the Nolan Ryan address

12 that you provided?

13   A.  This is the registered agent's address because

14 when you get the mail, registered agent -- the role is

15 to receive mail and -- and the 1520 is just the land.

16 I'm sorry.  There's no receiving capacity.

17   Q.  Understood.

18   A.  You always have to have --

19   Q.  Look above the box, not within the box, where

20 it lists the address for the Arlington Arena location as

21 the Royal Lane address.  Why is that not the Nolan Ryan

22 address?

23   A.  We probably gave that to receive mail.  And the

24 lawyers when they file the company with the secretary of

25 state, they normally use their office address to -- for

1  the correspondence.  It just -- it's just a choice.

2  There's no hard thinking into this.

3    Q.  So look with me at Exhibit Number 7, the one

4  that we just looked at.

5    A.  Yes.

6    Q.  Do you see on Exhibit 7 how the address for the

7  Addison location is the Emerald Street location?

8    A.  Sure.

9    Q.  Is that where the Addison location is located?

10   A.  No.  This is the CPA's office address to

11 receive mail.

12   Q.  Where is the Addison location?  What's that

13 address?

14   A.  That I don't remember.  It's on Montfort Road.

15 I forget the name, the number.  Montfort Road, Addison.

16   Q.  Okay.  If you'll look with me at exhibit --

17 back at Exhibit 6, what address is the address that is

18 listed for DN-KO The Colony?

19   A.  That looks like the address of the premises.

20   Q.  That is the actual physical location of The

21 Colony location?

22   A.  I believe so.

23   Q.  Looking at Number Exhibit 5, is that the CPA's

24 address again?

25   A.  Yes.  It's either CPA or the lawyer.

1    Q.  And then looking at Exhibit Number 3, that's

2  the physical location for the Northwest Highway

3  location, correct?

4    A.  Yes.

5    Q.  Okay.  So are you an owner of the Arlington

6  Arena location?

7    A.  Part owner, yes.

8    Q.  What's your percentage of ownership?

9    A.  Okay.  Let me see.  I need a calculator.  Can

10 I?

11        MR. LEE:  Here's one.

12   A.  Yeah, because -- oh.  I own 1.5 percent.

13   Q.  (BY MS. AVANT)  Who owns the other 85 point --

14   A.  Ninety --

15   Q.  95 --

16   A.  98.5 percent.

17   Q.  Yes, thank you.  98.5 percent.

18   A.  Other limited partners.

19   Q.  And who are they?

20   A.  Okay.  I'll do my best.  GCG Investments.

21 Willow Lane, LLC.

22   Q.  Willow Lane?

23   A.  Willow, W-i-l-l-o-w, Willow Lane.  Something

24 Hospitality, LLC.  Something Redevelopment, LLC.  Last

25 name Oh, O-h.  Forget the first name.  Mr. Oh.  Ms. Bae,

1  B-a-e.  Ms. Bae.  And then three individuals who are
2  just -- with the same last name, Yang, Yang and Yang.
3  And then two other individuals.  It's in my phone, but I
4  don't want to get -- but two other individuals.
5       Q.  Do you know their last names?
6       A.  They are EB-5 investors.  It's in the phone.
7       Q.  Okay.
8       A.  I'm not good with the Korean names.
9       Q.  Anyone else?
10      A.  And then me, myself.
11      Q.  Do you have any ownership in GCG Investments?
12      A.  No, ma'am.
13      Q.  Do you have any ownership in Willow Lane, LLC?
14      A.  No.
15      Q.  Do you have any ownership in hos- -- the entity
16  something Hospitality, LLC?
17      A.  No, ma'am.
18      Q.  Do you have any ownership in something
19  Redevelopment, LLC?
20      A.  No.
21      Q.  Is the redevelopment company the same
22  redevelopment company that owns ten percent of the
23  Addison location?
24      A.  Yes.
25      Q.  Is the Arlington Arena open yet?

---

1       A.  No, ma'am.
2       Q.  There is a building or you just own land?
3       A.  It's still under construction.
4       Q.  Do you have an open estimated date?
5       A.  Hopefully December, if not January.
6       Q.  December of this year?
7       A.  Yeah.
8       Q.  Currently is the Arlington Arena generating any
9  type of revenue?
10      A.  No, ma'am.
11      Q.  And so you don't receive any compensation from
12  that --
13      A.  No.
14      Q.  -- entity?
15      A.  No.
16      Q.  Who's going to be the manager of that entity
17  once it opens?
18      A.  I will be the manager.
19      Q.  Yourself or with someone else?
20      A.  I need a lot of help, so I would have
21  management.
22      Q.  You will have others helping you?
23      A.  Yes.
24      Q.  Who do you anticipate helping you?
25      A.  I'm still, you know, deciding, interviewing.

---

1       Q.  Do you anticipate the Arlington Arena being a
2  very profitable arena?
3       A.  I hope so.  Have to be, yeah.
4       Q.  The EB-5 investors, how much money did they
5  invest into the Arlington Arena?
6       A.  1.5 million.
7       Q.  Each?
8       A.  No, ma'am.
9       Q.  Total?
10      A.  Three investors, half a million dollar each.
11      Q.  Did GCG Investments invest any money into the
12  Arlington Arena?
13      A.  Yes.
14      Q.  How much?
15      A.  Okay.  It was more than once.  We had a capital
16  call, so I could be wrong but -- okay, $700,000.
17      Q.  Total?
18      A.  I think so, yeah.
19      Q.  Willow Lane, LLC, how much did it invest into
20  Arlington?
21      A.  Fairly insignificant.  He only owns one percent
22  so I don't remember how much, but fairly insignificant.
23      Q.  Do you have an estimate?
24      A.  10,000, I like to say.  Strike that.  I'm
25  sorry.  I don't remember.

---

1       Q.  You don't remember how much he invested?
2       A.  Yeah, because Willow Lane and the GCG, they
3  both together own 30 percent, but I know that inside
4  that, they had a deal, and I don't know what the deal
5  was, yeah.
6       Q.  Okay.  And so it's Willow Lane, L-a-n-e,
7  correct?
8       A.  Yeah, yeah, Willow Lane.  Yeah.
9       Q.  And GCG Investments you know, to your
10  knowledge, owns 29 percent --
11      A.  Yes.
12      Q.  -- and Willow Lane owns one percent?
13      A.  That's my -- yes, together.  They are a team.
14  They own 30 percent together but I know that Willow only
15  owns one percent.
16      Q.  And you don't know how much Willow Lane
17  invested?
18      A.  I don't know.  'Cause I received, I'm sorry,
19  money from GCG so I don't know how they collected the
20  money among themselves.
21      Q.  Fair.  The Hospitality entity, do you know how
22  much it invested into Arlington Arena?
23      A.  Uh-huh.  350,000.
24      Q.  Do you know what their percentage of ownership
25  is?

    A.  20 percent.

    Q.  The redevelopment entity, do you know how much
it invested into Arlington Arena?

    A.  250,000.

    Q.  And do you know what its ownership percentage
is?

    A.  15 percent.

    Q.  Mr. Oh, do you know how much he invested into
the Arlington Arena?

    A.  360,000.

    Q.  And do you know what his ownership percentage
is?

    A.  Ten percent.

    Q.  Ms. Bae -- did I say that correctly?

    A.  Huh?

    Q.  Ms. B-a-e?

    A.  Bae.

    Q.  Bae.  Ms. Bae, do you know how much she
invested into the Arlington Arena?

    A.  Yes.  She did 400,000.

    Q.  And what is her percentage?

    A.  Ten percent.

    Q.  The three individuals with the last name
Lang -- Yang.

    A.  Yang.

    Q.  Excuse me.  Do you know how much they invested
collectively?

    A.  Okay.  150,000.

    Q.  And that's collectively?

    A.  Yeah, collectively.

    Q.  And do you know what their percentage is as a
collective?

    A.  7.5 percent.

        MR. LEE:  Can I get some, just, clarity
related to this?  These are very obviously sensitive,
kind of confidential information.  I hope I'm in
agreement with you that these things can be maintained
confidentiality -- I'm not sure.  Do we have a
confidentiality agreement?

        MS. AVANT:  We have a protective order.

        MR. LEE:  Can we confirm that these numbers
and what they invest in and things like that can fall
within the confidentiality agreement or protective
order?

        MS. AVANT:  Yeah.  I think we have
procedures to where you can mark part of this as
confidential afterwards if you want to do that.

        MR. LEE:  Okay.  I don't -- I don't
have the order in front of me but I just want to confirm
that --

        MS. AVANT:  I'm pretty sure --

        MR. LEE:  -- these numbers are things that
I want to keep confidential.

    Q.  (BY MS. AVANT)  And then the EB-5 investors,
they invested 1.5 million?

    A.  (Indicating.)

    Q.  Do you know their ownership percentages
collectively?

    A.  Okay.  So the three investors --

    Q.  So there's three investors, not two.

    A.  Half a million dollar each, and each of them
owned -- owns two percent each, so six percent
collectively.

    Q.  Okay.  Thank you.

    A.  Does it add up?

    Q.  I couldn't tell you.  I could barely subtract
1.5 from 100.

        Looking at Exhibit 8.  So on this secretary
of state website, it does list you as the manager and
director?

    A.  Yes.

    Q.  Why do you not want the same protections for
the Arlington Arena location as you do the other
locations?

    A.  Okay.  So when -- when we started Arlington

Arena, it was really back in 2019.  Because of COVID, we
just couldn't get it done.  It just -- I was supposed to
be the man for this, so we kind of made a decision,
okay, so spread out, diversify to protect the company
and the managers.  So the -- I'm there for that reason
and -- so yeah.

    Q.  I'm not understanding.  What's the difference
with this entity as opposed to the other entities as to
why you want to be listed as the manager and director?

    A.  Oh, okay.  Well, because this entity is the
sort of centerpiece.  You know, this is -- it's -- am I
-- I believe this should be the -- the mother of all.
We have actual live combat here, actual fights.  I'm --
I'm a professional boxing MMA promoter.  I promote
fights.  We have fights here, actual fights, so this is
the main entity.

    Q.  Are you going to sell liquor at the Arlington
Arena?

    A.  Oh, yes.  Yeah.

    Q.  But because this is going to be what you, I
think, called as the mother entity, the main entity, you
wanted yourself listed on the secretary of state --

    A.  Yes.

    Q.  -- website for this one?

    A.  Yes.  That's the -- you know, I'm the big boy,

APP.0029

1  so I wanted to be on this paper, not the other.  Yeah.
2      Q.  You expect that the Arlington Arena is going to
3  be your most profitable entity?
4      A.  It's more -- it's more work and a lot heavily
5  regulated because we are regulated by the TDLR, Texas
6  Department of Licensing and Regulation.  So it's a
7  heavy, heavy business and I have to be the one to be
8  responsible.  So we made that decision long time ago,
9  but never came to fruition.
10     Q.  And none of the other Knockout entities that we
11 discussed have live fights at them?
12     A.  No, we just broadcast them on TVs.  But here,
13 actual fights happen.  You know, that's the difference.
14     Q.  The other entities that we discussed are just
15 sports bars?
16     A.  Yes.
17     Q.  And this is actually going to be an event
18 center?
19     A.  Yes.  Entertainment center.
20     Q.  Entertainment center.
21     A.  Yes.
22     Q.  Is the only thing that you plan on hosting are
23 fights, or do you plan on hosting other events?
24     A.  Live -- live band, cover band, karaokes, you
25 know.

---

1              (Clarification by reporter.)
2      A.  Karaoke.
3      Q.  (BY MS. AVANT)  You also have listed on the
4  secretary of state website Sang W. Han.  Is that the
5  same Sang Han as your brother?
6      A.  Yes, ma'am.
7      Q.  What does the W stand for?
8      A.  Wook, W-o-o-k.  Wook.
9      Q.  Did he invest any money into the Arlington
10 Arena?
11     A.  Just sweat -- sweat equity.  Yes.  Just sweat
12 equity.
13     Q.  Do you anticipate he will help manage this
14 entity with you?
15     A.  Yes.
16     Q.  Looking at his address, isn't this 2700 Old
17 Denton Road -- is that the house you currently live in?
18     A.  We all live together.
19     Q.  So I think you stated that you moved in there a
20 few months ago?
21     A.  Yeah.
22     Q.  Did he live in the house previously?
23     A.  No.  He's homeless.  So he -- I'm his father,
24 you know.  I -- I raised my -- I raised him, so he's
25 with me.

---

1      Q.  Understood.  What I'm trying to understand is
2  at what point did his address on the secretary of state
3  website change to 2700 Old Denton Road, if you know?
4      A.  Well, we added him.  When we added him, we have
5  to give his address.
6      Q.  Okay.  When did you add him on the Texas
7  website?
8      A.  Most recently.
9              (Clarification by reporter.)
10     A.  Most recently, yes.  Yeah.
11     Q.  (BY MS. AVANT)  And so it says to the left of
12 it that it was updated in October of 2023?
13     A.  Oh, yes, yes.
14     Q.  So that's when he was added?
15     A.  Yes.
16     Q.  The next entity that you formed was the Fort
17 Worth location?
18     A.  Yes.
19     Q.  That was in 2021?
20     A.  Yeah.
21     Q.  Post-COVID?
22     A.  Yes.
23     Q.  What is your ownership percentage of the Fort
24 Worth location?
25     A.  Now or at the time?

---

1      Q.  Let's do now first.
2      A.  Okay.  We sold it.
3      Q.  Okay.  When did you sell the Fort Worth
4  location?
5      A.  We sold it -- we sold it February 2023.
6      Q.  And who did you sell it to?
7      A.  There's two Asian franchisees.
8      Q.  Do you know their names?
9      A.  Yes.  One's Sen--- wait a minute.  Ashish,
10 A-s-h-i-s-h.  The other one is -- I'm sorry.  I don't
11 remember.
12     Q.  Do you know Ashish's last name?
13     A.  It's here.  It's in my phone.
14     Q.  Okay.  Are these friends?  Family?
15     A.  No, they just strangers who came across to buy
16 the store.
17     Q.  How much did they purchase the Fort Worth
18 location for?
19     A.  Okay.  We received $400,000.  Yeah, we got --
20 yeah, we got $400,000.
21     Q.  And what did you do with the $400,000 that you
22 received?
23     A.  Had a huge -- huge pill.  Store was a complete
24 loser.  Most of it went back to paying the liquor bills
25 and the bills and payrolls and taxes.  And then there

**Page 88**

```
1   was some left which I used to finish -- not finish --
2   to -- to pay bills for the Arlington Arena.
3       Q.  Of the 400,000 that you were paid for the
4   purchase of the Fort Worth location, how much is left?
5       A.  There is nothing left.
6       Q.  Prior to the sale, how much percentage did you
7   own of the Fort Worth location?
8       A.  That was a hundred percent my store.
9       Q.  So you received all profits and distributions
10  for that store?
11      A.  If there was a profit, but there was no profit.
12      Q.  Was there never a profit?
13      A.  No, ma'am.
14      Q.  There wasn't a single month between June 2021
15  and February 2023, in which the Fort Worth store was
16  profitable?
17      A.  Okay.  So if you do a month-to-month P&L, one
18  month might show a profit, but the next month you have
19  double the size of losses.  So you thought you made
20  money, but then it goes right back in.  At the end,
21  the -- the duration of the business, it was bloody,
22  bloody wreck, so no.
23      Q.  At the end of the business it was a loss?
24      A.  To answer your question, some months were
25  profitable, yes, but it doesn't matter.  You just keep
```

**Page 89**

```
1   right back to pay the bill.
2       Q.  Understood.  What was your reasoning for owning
3   the Fort Worth location a hundred percent by yourself?
4       A.  I was -- I was so interested to have a store in
5   Fort Worth to, you know, grab the market share of the
6   Fort Worth business, but I didn't know anything about
7   Fort Worth.  It was to expand the territory.  Could not
8   find a franchisee, so I took upon myself to open it,
9   which was a bad decision.
10      Q.  How much did you invest into the Fort Worth
11  store?
12      A.  Borrow money heavily and still owe money, but
13  total that went in, easily three-quarter million
14  dollars.
15      Q.  Three-quarters of a million?
16      A.  Yeah.
17      Q.  The Arlington Arena store, how much did you
18  invest into it to date?
19      A.  Arlington Arena, I put everything that I owned
20  into Arlington Arena.
21      Q.  How much is that?
22      A.  Over the course of four years, about a million
23  dollars.
24      Q.  Cash, or were you borrowing money?
25      A.  I borrow money and I put all the cash I earned
```

**Page 90**

```
1   from other stores through royalties, and everything that
2   I had went into this Arlington Arena.
3       Q.  How much did you borrow for the Arlington Arena
4   store?
5       A.  So when I say borrow, I borrow money from
6   investors, and then invest in the construction, and I'll
7   give them my shares little by little over time.  So my
8   80, 90 percent, my share shrank to 1.5 percent because
9   all I could give was my shares for their money.
10      Q.  The Addison location, how much did you invest
11  into it over the years?
12      A.  Addison store, I put in about quarter million
13  of my money.
14      Q.  The Colony location, did you invest any money
15  into that?
16      A.  No, ma'am.
17      Q.  The KOSOB Arlington location, did you invest
18  any money into that?
19      A.  No, ma'am.
20      Q.  The Deep Ellum location, did you invest any
21  money into that?
22      A.  No.
23      Q.  And then the Northwest Highway location, did
24  you invest any money into that?
25      A.  Yes.
```

**Page 91**

```
1       Q.  Approximately how much?
2       A.  Northwest only had one investor.  Half a
3   million.  It wasn't enough, so I had to put in another
4   hundred to hundred fifty thousand.
5       Q.  A hundred to 250,000?
6       A.  No, a hundred to 150,000.
7       Q.  A hundred to 150,000?
8       A.  Yeah.
9       Q.  Were you drawing a salary from the Fort Worth
10  location?
11      A.  No, ma'am.
12      Q.  During COVID, did you receive the approximately
13  thousand dollars a month from the government?
14      A.  For?
15      Q.  The Fort Worth location?
16      A.  No.  It opened most recent -- it opened
17  recently.  Was not beneficial -- I'm -- it was not a
18  beneficiary.
19      Q.  Of the program?
20      A.  Yeah.  It was too -- too late.
21          (Deposition Exhibit 9 marked for
22          identification.)
23      Q.  (BY MS. AVANT)  So I'm going to show you what
24  has been marked as Exhibit 9.  So the Fort Worth
25  location was opened -- or strike that.
```

1    The Fort Worth location was formed
2  June 3rd, 2021; that sounds accurate?
3      A.  Yes.
4      Q.  And then again, this 11445 Emerald Street,
5  that's either your CPA's office or your attorney's
6  office?
7      A.  Yes.
8      Q.  And again, here it has your mother, Myoung
9  Park, as the only member of the Fort Worth location,
10 correct?
11     A.  Yes.
12     Q.  Did she perform any managerial duties for the
13 Fort Worth location?
14     A.  No.
15     Q.  Did she help with the operations of the Fort
16 Worth location?
17     A.  No.
18     Q.  Did she receive any profits or distributions
19 for the Fort Worth location?
20     A.  No, ma'am.
21     Q.  Did she draw a salary at the Fort Worth
22 location?
23     A.  No.
24     Q.  Why do you have her listed as the only member
25 when she was not involved in the Fort Worth location?

---

1      A.  For the same reason.  We -- we diversified the
2  risks.
3      Q.  And your mother was okay with being a risk for
4  these Knockout entities to your knowledge?
5          MR. LEE:  Objection.  Form.
6      Q.  (BY MS. AVANT)  You can answer.
7      A.  Yes.  She volunteer.  She understands.
8      Q.  The address listed for her is 4601 Byron
9  Circle, Irving, Texas.  Do you know what address that
10 is?
11     A.  Yes, the old address.
12     Q.  An old address of where you lived?
13     A.  We live together, but this was back in -- yeah,
14 this is old address.  This is not the current address.
15     Q.  I want to try to understand.  This is an old
16 address that you lived at, correct?
17     A.  My mother and I.
18     Q.  Okay.  When did your mother and you stop living
19 at the Byron Circle address?
20     A.  I don't know why this address is here, but this
21 is almost -- almost five, six years ago.
22     Q.  Do you know who lives at the Byron Circle
23 address now?
24     A.  No.
25     Q.  Are there any other Knockout locations that you

---

1  are trying to open as of today?
2      A.  I just want to open Arlington Arena.
3      Q.  So is that a no?
4      A.  No.  Yeah.  No.
5      Q.  Of the Knockout entities that we just
6  discussed, who controls the finances of those locations?
7  Is it the same for all of the entities?
8          MR. LEE:  Objection.  Form.
9      A.  The -- the EB-5 funded stores are run by me,
10 and the franchise locations are run by them.
11     Q.  (BY MS. AVANT)  Which locations are the
12 franchise locations other than The Colony?
13     A.  Okay.  Northwest Highway.  As of today,
14 Northwest Highway, Fort Worth, Plano, Addison,
15 Grapevine.  I'm trying to think.  So yeah, I think so.
16 I give you five names, ma'am, the franchisees.
17     Q.  The -- the Plano location, what -- do you know
18 the entity name of that one?
19     A.  It's KOSB.  I want to always call KOSB Plano,
20 but they have their own legal name, which I'm not sure.
21     Q.  Okay.  And then the Grapevine location, do you
22 know what their legal name is?
23     A.  KOSB Grapevine, LLC, but it could be slightly
24 different.
25     Q.  Do you know when that franchise was opened?

---

1      A.  Okay.  Early this year.  January, February.
2      Q.  January, February of 2023?
3      A.  Yeah.
4      Q.  When was the Plano location opened?
5      A.  That was sometime in 2022, May -- May or June.
6      Q.  So let's talk 2022 time period, so my questions
7  are during the 2022 time period.  In 2022, who
8  controlled the finances for the Knockout locations?
9          MR. LEE:  Objection.  Form.
10     A.  '22.  There's -- distinction.  Corporate stores
11 or franchise stores?
12     Q.  (BY MS. AVANT)  In 2022, how many franchise
13 stores did you have?
14     A.  Okay.  The Colony, Plano, Lewisville,
15 Grapevine, Fort Worth.  Six.
16     Q.  I heard you listing The Colony, Plano,
17 Lewisville, Grapevine.  What are the other two?
18     A.  And then -- this is 2022, right?
19     Q.  Yes.
20     A.  So, okay.  The Colony, Plano -- Colony, Plano,
21 Lewisville -- I'm sorry.  That's right.  2022, there was
22 no Grapevine.  Okay.  I got it.  I got the question.
23 Okay.  Okay.  The Colony, Plano, Lewisville.  That's it.
24 Franchisees, yeah.
25     Q.  When did Lewisville open?

```
 1              (Cross talk.)
 2         MR. LEE:  I want the record to reflect you
 3    did not let him finish the answer to the question that
 4    she asked and he was answering the question.  You can
 5    move forward.
 6         THE WITNESS:  I try best -- better.
 7         MR. LEE:  Go ahead.
 8    Q.  (BY MS. AVANT)  You said you fired her because
 9    she didn't perform her job duty.  What job duty did she
10    not perform that made you fire her?
11         MR. LEE:  Objection.  Form.
12    A.  Her -- the lack of a performance, whether it's
13    missing the time line, missing the deadline, not doing
14    enough, not doing it thoroughly enough.  All that kind
15    of added up and got to me.  And then she will turn the
16    table around and tell me how to do my job.  And even
17    though I loved her hopelessly, I couldn't take it
18    sometimes.  She overstepped her boundary.  So if she
19    don't like how I do business, then leave, was the kind
20    of -- and then I fired her, maybe for the day.  Next day
21    I call her back.  I'm sorry, come back.  I hurt your
22    feelings.  There was the routine pattern.  So I fired
23    her just for the day.
24    Q.  (BY MS. AVANT)  Thank you.  Are there any other
25    reasons, other than what you just listed, with regard to
```

```
 1    her performance that caused you to fire her?
 2    A.  Other than performance?  I'm sorry.
 3         MR. LEE:  So she's asking --
 4    Q.  (BY MS. AVANT)  Related to performance.
 5    A.  Other than performance?
 6    Q.  Related to performance.  Any other reasons?
 7    A.  Oh.  I just overly generalize so inclusive
 8    of -- of -- yeah.
 9    Q.  When Ms. Freeman started, the only location was
10    the Northwest Highway location, correct?
11    A.  Yes.
12    Q.  At some point in time, did you tell Ms. Freeman
13    that you would pay her $10,000 for every Knockout
14    location that she assisted you in opening?
15    A.  Yes.
16    Q.  Did she help you -- did she assist you in
17    opening Deep Ellum?
18    A.  No, ma'am.
19    Q.  No, she didn't help you open Deep Ellum?
20    A.  No, ma'am.
21    Q.  Was that open prior to her start date?
22    A.  No, she started, but then Deep Ellum opened
23    without her help.
24    Q.  Opened -- she was not involved in the opening
25    of Deep Ellum at all?
```

```
 1    A.  No, ma'am.
 2    Q.  What about Arlington, did she help open
 3    Arlington?
 4    A.  No, ma'am.  I want to correct my answer.  Even
 5    though she might have helped, which I'm not aware of,
 6    when I promised her the 10,000, that was after we opened
 7    Deep Ellum, after we opened Arlington.
 8    Q.  Okay.
 9    A.  So that --
10    Q.  Those were already open --
11    A.  Yes.
12    Q.  -- by the time you offered it to her?
13    A.  Yeah.  I offered her 10,000 after these are
14    open that you just mentioned.
15    Q.  Okay.
16    A.  So could not apply to those.
17    Q.  And looking at Exhibit 5, you opened -- you
18    created Arlington January 30th, 2018, you see that?
19    A.  Yes.
20    Q.  So sometime after January 30th, 2018, you
21    offered her the $10,000 for assisting in opening
22    additional entities?
23    A.  Yes, but it wasn't '18.  It wasn't '19.  It
24    wasn't '20.  I offered her the 10,000 2021-ish --
25    Q.  Okay.
```

```
 1    A.  -- or 2022, yeah.
 2    Q.  Okay.
 3    A.  2022, yeah.  That came up because I wanted to
 4    pay her more.
 5         (Clarification by reporter.)
 6    A.  Wanted to pay her -- I always find ways to pay
 7    her more.  Yeah.
 8    Q.  (BY MS. AVANT)  Did she assist in the opening
 9    of The Colony location?
10    A.  No.
11    Q.  Did she assist in the opening of the Addison
12    location?
13    A.  Addison location?  No.
14    Q.  Did she assist in the opening of Arlington --
15    strike that.
16         Did she assist in helping open Arlington
17    Arena?
18    A.  No, ma'am.
19    Q.  She didn't have any --
20    A.  She didn't even visit the location.  The
21    Arlington Arena, she might have visited once, but
22    Arlington Arena is not open yet.  It's -- no employees.
23    We don't even have -- we only have a construction crew
24    right now.  No employees ever needed, no.  Answer's no.
25    Q.  Has she assisted in any of the blueprints or
```

1  what the operations will be or what the entity will look
2  like in the future?  Did she assist in any of that?
3      A.  Okay.  When I asked her, hey, I'm gonna write
4  about my philosophy.  My English is second language.  So
5  she brushed up, cleaned up my paragraphs, yeah.  She did
6  that.  But assisting opening a restaurant, no.
7      Q.  But she assisted you in statements that you
8  were making?
9      A.  Pretty much philosophy, you know, the mission
10 statement, company mission statement, company
11 philosophy, yes.
12     Q.  Helping with that?
13     A.  Yeah.
14     Q.  Did she help in assisting -- strike that.
15         Did she help open the Fort Worth location?
16     A.  No.  She visited once with me.  We took a tour.
17 That's it.
18     Q.  Okay.  Did Ms. Freeman perform work for the
19 Northwest Highway location?  Did she do managerial work,
20 HR work, for the Northwest Highway location?
21     A.  At the time, managerial only, and then she
22 moved up.  So floor management, what she did at
23 Northwest Highway.
24     Q.  Okay.
25     A.  But not the --

---

1      Q.  She didn't do HR work for Northwest Highway?
2      A.  HR means -- HR means hiring/firing or
3  interviewing?
4      Q.  Yes.  Hiring and firing.
5      A.  That's floor management.
6      Q.  Okay.
7      A.  Yeah.
8      Q.  You classify that as floor management?
9      A.  Yeah.  HR at the time did not exist.  We were
10 so small.  One store.  But we didn't even call HR.  We
11 call HR later, so the answer is no.  At that time, no.
12     Q.  Okay.  Let me ask a better question.
13         From her hire date in 2018 till her
14 termination date in 2022, did she perform job duties at
15 the Northwest location?
16         MR. LEE:  Objection.  Form.
17     A.  Job duties?  Yes.
18     Q.  (BY MS. AVANT)  Okay.  Did she perform work at
19 the Deep Ellum location between 2018 when she was hired,
20 and 2022 when she was fired?
21         MR. LEE:  Objection.  Form.  You haven't
22 established that she was fired.
23     Q.  (BY MS. AVANT)  Did -- did Ms. Freeman perform
24 job duties at the Deep Ellum location from 2018 to 2022?
25     A.  Job duty lo-  -- job duties for the company?

---

1      Q.  Yes.
2      A.  Yes.  Not for Deep Ellum, per se.  In other
3  words, she was -- she was -- by that time she was
4  already above the general manager, meaning she's no
5  longer just glued to one store.  She's already now above
6  all the GM.  Remember you ask me hierarchy.  So she was
7  already up there.  When she was working at Deep Ellum,
8  she was there as the corporate director sort of
9  overseeing.  So I -- I have to be precise in your
10 answering.  So did she do the work duties of Deep Ellum?
11 No.  Did she do the work duties of the corporate?  Yes.
12     Q.  Okay.  Doing the work duties of the corporate,
13 what entity that we discussed today did she not do
14 corporate work duties for during the 2018-2022 time
15 frame?
16     Q.  Okay.  Could you repeat that?  I'm sorry.
17     Q.  From 2018 to 2022, is there any entity that we
18 discussed today that Ms. Freeman did not perform the
19 corporate work duties for?
20         MR. LEE:  Objection.  Form.
21     A.  Oh.  She -- she did the work duties for the
22 corporate on every KO location.
23     Q.  (BY MS. AVANT)  Okay.
24     A.  Including Deep Ellum.
25     Q.  Okay.  And does that also include DN-KO The

---

1  Colony?
2      A.  She was dispatched to oversee -- not oversee --
3  I'm sorry -- to inspect, to train the franchisees.
4      Q.  Okay.  When was the first time you and Ms.
5  Freeman were intimate?
6      A.  After she came back from Oregon.
7      Q.  How soon after she came back from Oregon?
8  Weeks?
9      A.  Couple of -- couple of months.  Yeah.
10     Q.  Were you guys first intimate at a Knockout
11 location?  A hotel?  Where?
12     A.  No, ma'am, not -- at the workplace.  It
13 was -- first intimate --
14         MR. LEE:  Intimate, you mean sexual
15 relations or any type of contact?
16         MS. AVANT:  Any type of sexual contact.
17     A.  I asked her out.
18         MR. LEE:  You mean kissing?
19         MS. AVANT:  Any -- anything.
20     A.  Asking her out is -- I can start.  I asked her
21 out.
22     Q.  (BY MS. AVANT)  You asked her out on a date?
23     A.  Yes.
24     Q.  Where did you guys go?
25     A.  The -- the restaurant at the Four Seasons.

1  that.  It just does not make sense.  This is America.
2  This is not China.  Please.  It just does not make any
3  sense.
4      Q.  (BY MS. AVANT)  In early April 2022, were you
5  and Ms. Freeman engaging in other sexual activities,
6  fellatio, anything of that sort?
7      A.  She wanted to -- she wanted to have a -- you
8  know, physical but not intercourse.  And of course, I
9  wanted intercourse, but then she said it's not possible,
10  so I didn't pursue it.
11      Q.  You accepted it?
12      A.  Yes, of course.  Yes.
13      Q.  Looking back at Exhibit 2, will you flip with
14  me to page 356.
15          MR. LEE:  356?
16      Q.  (BY MS. AVANT)  Yes.  Are you there?
17      A.  Yeah.
18      Q.  I'm reading the first message from you,
19  March 15th, '22 -- 2022, 3:33:58 a.m.  You state "If you
20  keep your guard up so high that I can't even see or kiss
21  your vagina, what is the point of having time together?
22  I know you said that even if I can get it in there, you
23  will have a cramp, but why can't I just kiss it and
24  finger it near the surface?  That will be enough for me
25  while you keep your vagina muscles intact so you can get

1  the surgery without complication.  But you put this sign
2  up saying 'closed' near your thigh to keep me away.
3  With that sign up, I cannot get anywhere near you
4  whatsoever.  I feel so bad and lonely now.  You could
5  tell me to be gentle and not to penetrate too deeply and
6  I can work meticulously with you on that."  Did you say
7  that to Ms. Freeman in March of 2022?
8      A.  Yes.  I did that out of desperation.  Yes.
9      Q.  That doesn't sound like someone that is
10  accepting of her medical condition, correct?
11          MR. LEE:  Objection.  Form.
12      A.  No, it is very accepting of her medical
13  condition.  I know exactly why I said that.  This is --
14  I -- I wanted her so much, but she said no intercourse.
15  So that was -- she's very good at drawing the line and
16  she's in charge, always in charge.  One time went to the
17  hotel, she told me -- can I continue?
18      Q.  Please.
19      A.  She -- she -- she -- she draws the line.  And
20  sometimes she says, "Angelo, do not put your hand
21  underneath my shirt.  Just touch my breast on top of the
22  shirt."  That's the kind of distinct orders that I get
23  and I oblige.  And all night she was talking business,
24  romance, family, friends, and I'm -- my hand is only on
25  top of her shirt.  Why?  Because she order me not to go

1  underneath.  That is the -- the relationship that we
2  have.
3          Now, when she told me no intercourse, she
4  have a different line she draws.  Sometimes she would
5  let me get nearer but never intercourse during this
6  time.  So what I'm -- what I'm pleading with her is I
7  want a little bit more romance.  I want more -- you
8  know, I want -- I want to touch you.  You know, I want
9  to touch you, and there's nothing wrong with that.  I
10  want to touch you, so I will not do that.  No
11  intercourse.  But she's perfectly medically okay for me
12  to do a little bit of those romantic, you know, act of
13  love.  It's -- to me, I'm so desperate.  I'm a little
14  puppy asking for breast milk.  And if you read it, it --
15  I am so pathetically in love with her, I mean, I'm
16  begging her to allow me to kiss her.  It just -- it's
17  almost like I feel like I'm not a man enough, but I
18  cannot violate her, so whatever she says, I got to do.
19  And when I come home, you know, I agonize.  Oh, I miss
20  her more.
21          So I wrote this -- this text.  It's so from
22  the heart.  It's so pure.  It's beautiful.  It's two,
23  man and woman, adults, have a serious sexual need,
24  having a conversation of sexual need.  And I don't think
25  this is any harassment.  I will say that again.  But

1  where she draws the line, I follow the line.  The -- I
2  told you, she and I decide to go to hotel, spend the
3  whole night.  And then she goes, "Okay, tonight, just
4  don't put your hand under the shirt."  And I'm a man but
5  I listen to her and I just do that.  And then we talk
6  about the bakery, future bakery.  We wanted to build a
7  bakery.
8          So she's having margarita.  There were
9  martinis, and I'm holding her but never moving my hand
10  under the shirt the entire night.  That's me following
11  the rules.  She's in charge of me.  So this is a
12  testimony that I follow the rules because I follow
13  rules.  But I wanted more than that so -- but did I say
14  I want to have sex with you?  No, because I know the
15  line, you know.  I mean, it's pathetic, but it's almost
16  disgusting, but it's so, so, so beautiful to me.  I'm
17  just being very -- okay.  I'm just being very childishly
18  in love.
19      Q.  You're begging her after she already said no?
20      A.  I mean, she said no, so I didn't do it, but I
21  could still ask.
22      Q.  So yes, you're begging her after she told you
23  no?
24      A.  But this was after we -- we -- when we went
25  home.  It's not when we were together.

**Page 192**

1    Q.  Right.  But you're begging her in a text
2    message?
3    A.  Well, she could always say no and then I follow
4    her.  I have to obey, but I want candy.  I had to ask,
5    mom, can I have candy.  She's my lover.  I love her, so
6    can I kiss you more?  Yeah, begging.
7    Q.  And you understand that she didn't want you to
8    put your hand under her shirt because she didn't want
9    you touching her?
10    MR. LEE:  Objection.  Form.
11    A.  Ma'am, I did not know she did -- she did not
12    want me at all, then she would not be in the hotel room
13    in the first place.  I -- I never knew that she did not
14    like me until this lawsuit reveal.
15    MR. LEE:  Are we at a breaking point, a
16    stopping point?
17    MS. AVANT:  Yeah, we can take a break
18    before I move to the next thing.
19    MR. LEE:  Thanks.
20    THE VIDEOGRAPHER:  Going off the record.
21    4:00 p.m.
22    (Break taken from 4:00 p.m. to 4:17 p.m.)
23    THE VIDEOGRAPHER:  Going on the record.
24    4:17 p.m.
25    Q.  (BY MS. AVANT)  Mr. Park, do you remember

**Page 193**

1    telling Ms. Freeman that you've never raped anyone
2    before?
3    A.  That's right.
4    Q.  Do you think it's an accomplishment to have
5    never raped someone?
6    A.  No.  No.
7    Q.  Do you pride yourself on not having raped
8    someone before?
9    A.  No, ma'am.  There's -- that's not why I said
10    that, no.
11    Q.  Why would -- why would you say that to her?
12    A.  One of the conversations she made -- made me
13    out to be, you know, fairly lowly standard and -- and it
14    was, again, very emotional, heated argument.  And I kind
15    of snapped and saying, you know, that the man that you
16    have babies with raped you against your will.  And she
17    told me very clearly how she was raped by this man John,
18    but then she was hiding it behind me.  So I said, you
19    know, at least I'm not -- at least I'm not that kind of
20    guy.  You know, I -- so the context was there, but even
21    then I should have, you know -- that's very stupid of me
22    to say that, but the context is that I am telling her
23    your own guy that -- that you had babies with, I mean,
24    he raped you, but I didn't even go near.  That was the
25    background to that.  I just didn't think that I never

**Page 194**

1    raped so I'm a good man.  That's -- that's not how it
2    was.
3    Q.  You were trying to explain to her that you were
4    a better man than John because you've never raped her?
5    A.  No, not -- I don't compare like that.  I don't
6    feel superior to anybody.
7    Q.  Were you trying to manipulate her into thinking
8    that your actions were acceptable because you had never
9    raped her?
10    A.  No.  She has a ways of making me feel so bad
11    comparing, you know, me to -- to other men, especially
12    his -- you know, other fathers of children, so I -- and
13    then she was almost protecting him by hiding him behind
14    her, so that's -- that's why I think I was saying such a
15    thing.  But other than that, I -- there would be no
16    other context under which to say something like that.
17    Q.  And you agree that you told her multiple times
18    between 2018 and 2022, that you have never raped someone
19    before?
20    A.  I never did and I never will, so it -- that
21    conversation kind of funny, but it's a fact.  It's a
22    fact.  Not only that time frame but my entire life, that
23    that's not what I'm capable of.  I'm a puppy.  It's
24    something that I could not even imagine.  So I want to
25    kind of let her know, hey, I'm not that kind.  Yeah.

**Page 195**

1    Q.  And you did tell it to her multiple times?
2    A.  I'm not a rapist.  You know, I'll never rape
3    you.  Don't worry.  I'm not John.  You know, cynically.
4    Q.  So that's a yes, you did tell her multiple
5    times?
6    A.  No.  Maybe once or two times, but yeah.
7    Q.  You're aware that Ms. Freeman is a victim of
8    sexual assault?
9    A.  Yeah.
10    Q.  You're aware that she was molested by her
11    father as a child?
12    A.  Yes.
13    Q.  You're aware that she was gang-raped while she
14    was a dancer?
15    A.  Yes.
16    Q.  And you're aware that she was assaulted by the
17    father of one of her children?
18    A.  Yes.
19    Q.  Knowing all of that, you thought it was
20    appropriate to discuss rape with Ms. Freeman?
21    A.  Huh?
22    Q.  Knowing all of that, you thought it was
23    appropriate to reference rape with Ms. Freeman?
24    A.  I was mean.  Yeah, it sounds really mean now,
25    you know.  Yeah, it's a mean thing to say, but she tried

1 to put me down to the level of some of the old -- old
2 men that she had been raped by, and I just didn't want
3 to be associated with them.  Ma'am, I'm sorry, but she
4 could really piss you off and -- and I fell for it.  I
5 got pissed off.
6     Q.  Were you trying to emotionally harm her by
7 making rape comments to her?
8     A.  I didn't think that way, no.  It was just -- it
9 just came out the wrong way.  No.  I love her.  I still
10 love her.  You know, I still love her.  No.
11     Q.  You would agree with me that your comments
12 about rape to Ms. Freeman are egregious?
13     A.  Bad.  I don't know about egregious, but bad.
14     Q.  Were you trying to manipulate Ms. Freeman into
15 thinking you were a good person?
16     A.  No.  I don't have to really work hard on that.
17 Yeah.  No.  That wasn't my intent.  It just came out the
18 wrong way.
19         (Deposition Exhibit 12 marked for
20         identification.)
21     Q.  (BY MS. AVANT)  I'm going to hand you what I
22 have marked as Exhibit 12.  Exhibit 12 are messages that
23 you produced in this lawsuit, correct?
24     A.  Yes.
25         MR. LEE:  We produced them after getting

1 the forensics.
2     Q.  (BY MS. AVANT)  So flip with me to page 61,
3 Park 61.
4     A.  Yes.
5     Q.  I'm looking at line 245 and --
6         MR. LEE:  Sorry, page 61?
7         MS. AVANT:  Park 61.
8         MR. LEE:  Page 61?
9         MS. AVANT:  Park 61.
10        MR. LEE:  I'm off.  I'm sorry.
11        MS. AVANT:  Park.
12        MR. LEE:  Oh, Park 61.  Okay.  Can you give
13 me the page number on the bottom --
14        MS. AVANT:  24.
15        MR. LEE:  Thank you.  Sorry.
16    Q.  (BY MS. AVANT)  So I'm starting at 245 and I'm
17 going to read up because your messages don't read down.
18    A.  Okay.
19    Q.  Does that make sense?  Timewise they read up.
20    A.  Okay.  I'm going to clear my eyes.
21    Q.  Go ahead.
22    A.  Okay.  So I can see better.  Okay, ma'am.
23    Q.  So 245, you text Ms. Freeman "Go to hell and
24 stay there.  Don't try to get out of hell using your
25 cunt.  Remember it doesn't work.  But those souls in

1 hell will not be nice.  They will rape you.  I never put
2 a finger in it when I could have."  Are those things you
3 said to Ms. Freeman?
4     A.  Yes.
5     Q.  Do you consider these statements about rape to
6 Ms. Freeman to be egregious?
7         MR. LEE:  Can I -- if you're going to
8 respond to the statements, you're going to have to give
9 context, and so please feel free to read whatever you
10 need to read around that in order to get the proper
11 context.
12    Q.  (BY MS. AVANT)  The context is it's April 2nd,
13 2022.
14    A.  Yes.
15    Q.  That -- you got the context?
16    A.  Yes.  Yes.  This is the -- okay, ma'am.  Now I
17 can see.  This is the last -- the day of our
18 relationship.
19         (Discussion off the record.)
20         (Requested portion was read.)
21    Q.  (BY MS. AVANT)  So the question is --
22    A.  Okay.
23    Q.  The question is, did you consider the
24 statements that I just read about rape to Ms. Freeman to
25 be egregious?

1     A.  Okay.  So this was at the peak of our -- it was
2 the moment of a volcano erupting.  She and I were at it.
3 I'm 3,000 miles away, Korea, trying to come home to her
4 but she -- she hangs up.  Will not pick up, so I'm
5 desperate to kind of make amends.  And she would avoid
6 because she will not tell the truth about her cousin
7 being the father of -- it's all -- I just wanted to hear
8 the truth because I respect the fathers.  You need the
9 fathers of children.  That's my philosophy, position.
10 Good.  Have the fathers around.  But she would lie.
11 John told me everything because she would lie, so -- and
12 then she was with Mike the night awake, campfire
13 somewhere, and I don't want to be -- I don't want to
14 sound stupid but I -- I pay for all those trips and then
15 she -- she invites Mike over.  So I -- okay.  So just
16 tell me what's going on.  And she will not come clean.
17 She will not tell me the truth straightforward.  She --
18 usually she was straight, but she would just not.  So I
19 was going nuts.  I got drunk.  I got stupid.  I got
20 really upset and I spurted out these words, and I am so
21 regretful.  Okay.  So understand the background.
22         I don't enjoy saying these things.  I'm
23 actually very shamed and embarrassed.  But I -- I'm
24 about to lose my -- my love of my life, and she's lying
25 to me again after John came clean.  And John told me

1  about Mike.  She -- all she had to do was yes, but she
2  was just -- she couldn't.  So when she doesn't tell me,
3  then I'm just imagining things.  Okay.  Then what's
4  going on tonight with you guys?  I mean, imagining,
5  paranoid.  That's why I -- I said these things.  Yeah.
6  So it was bad.  So please, put this in -- in perspective
7  and context, just for the fairness.
8      Q.  So my question to you is:  Telling Ms. Freeman
9  the souls in hell will not be nice, they will rape you,
10  do you believe that that statement is egregious?
11     A.  It's -- it's really bad.  It's stupid and
12  it's -- it's bad.
13     Q.  And you said it to hurt her?
14     A.  I was drunk.  I did not have any intent.  It
15  just -- I just said it.  Okay.  I did not want to hurt
16  her now.  No, no.  She plans things.  She's a master
17  planner.  I'm not.  I'm just desperate, you know, for --
18  for getting back to her.  Physically, I'm 5,000 miles
19  away actually, yeah, so I -- and it -- she, you know,
20  she's with the guy that she's lying about on my -- well,
21  the money is not important here, but still I'm --
22  everything that she does I pay beyond and above.
23  Whenever she says -- whenever she says anything about
24  the need for money, I find the money.  I don't care
25  about my bills.  Just pay her first.  Give it to her

1  first.  That's the moment I'm in.  And then I get the
2  news that she's spending the weekend with Mike and she
3  not telling me who Mike is.  If she said, Angelo, I want
4  Mike to spend some time with her -- with his daughter,
5  okay, perfect.  No, she would not.  She would go
6  around -- I could -- so, ma'am, I -- I just lost it.
7  Okay?  I lost it.  And I'm sorry I said it.  I
8  apologize.  I regret it.  But I did not say that to hurt
9  her.  It just came out.
10     Q.  You knew the statements that you made on Park
11  61 would hurt her, though?
12     A.  At the time I didn't even think that way.  I
13  just -- I was in pain and I was scared.  I'm losing --
14  'cause I could feel this could be the last straw.  I'm
15  scared of losing her.  It's like a world coming down.  I
16  don't know if you ever feel that way, but I was actually
17  there.
18     Q.  And you state "I never put a finger in it when
19  I could have."  It appears that you understand that as a
20  man you have the physical ability to force yourself upon
21  Ms. Freeman if you wanted, correct?
22         MR. LEE:  Objection.  Form.
23     A.  Ma'am, when man and woman are in love, when
24  they have sex, one may advance -- one may want to
25  advance more than the other, you know, the other

1  partner.  It could be woman wanting more sex when the
2  man is tired.  Woman can demand more.  That's -- that's
3  perfectly beautiful.  And man can say, hey, I want some
4  more, more.  She might say, no, I'm tired.  Well, I want
5  some more.  It's all beautiful.  It's so beautiful.  But
6  that intimacy, I -- I -- I need.  I want.  So when I say
7  can I finger around your, you know, sensitive part, I
8  think that's beautiful.  But I'm only asking.  I could
9  have done it more but I didn't do it, but a lot of men
10  do it.  A lot of women do it.  I know a lot of women
11  demand more.  They demand.  They yell at the guy.  You
12  know, it -- you know that.  We are adults.  So I'm
13  begging her and I'm telling her I could have done more,
14  but that I didn't do it.  I'm just being so brutally
15  honest with my feelings.
16     Q.  So you could have forced yourself upon her but
17  you chose --
18     A.  I could never do it.
19         MR. LEE:  Objection.  Form.
20     A.  No, ma'am, I could never do it.  It's just the
21  words.  I could never do it.  I never done it by the
22  way.  I never did it.  Never crossed a line by an inch.
23  Never crossed the line.
24     Q.  (BY MS. AVANT)  Are these the type of
25  statements that you say to someone that you love?

1          MR. LEE:  Objection.  Form.
2      A.  No, ma'am, no.  I was scared to -- I was really
3  scared of losing her.  The world is caving down because
4  I felt this is the last straw, and I was right.  See?
5  This is the end of it.  Because I felt like oh, my God,
6  maybe this is it.  She's not telling me the truth and I
7  can't handle it.  You know, I was scared of losing her.
8  So by --
9          MR. LEE:  Objection.  Nonresponsive.
10     Q.  (BY MS. AVANT)  You agree that you -- you agree
11  that these are the type of things that you say to
12  someone that you lost control over, correct?
13         MR. LEE:  Objection.  Form.
14     A.  Never did it.  Never done before.  This the
15  first time.  For the record, I never loved a woman like
16  I love Freeman.  Okay?  I'm a married man but never
17  loved a woman like I loved her, so this does not happen
18  repeatedly.  First time and last time.  I don't think
19  I'm ever gonna find a woman like that.
20     Q.  On April 2nd, 2022, do you think you lost
21  control of Ms. Freeman?
22         MR. LEE:  Objection.  Form.
23     A.  Again, I was -- I was drunk, and I was stupid,
24  and I was scared, and all this came out with no
25  intention, no planning.  And I regret it deeply.

Q.  (BY MS. AVANT)  I'm asking a slightly different
question.  You sending these messages on April 2nd,
2022, are you sending these because you think you lost
control of Ms. Freeman and the relationship?

MR. LEE:  Objection.  Form.

A.  No, I cannot be that structured in thinking,
no.  Not because I lost control in the relationship, no.
I just lost myself.  And when I spoke of this evil, you
know, stupid words.  I just lost control of me.  Not
over losing control of the relationship, no.  Not that
calculated, no.

Q.  These are the type of messages that someone
that's abusive would say, correct?

MR. LEE:  Objection.  Form.  Don't answer
that question.  That is absolutely -- he can't answer as
to what somebody abusive -- say the word abusive and
just pestering him and harassing him, and don't answer
the question.

Q.  (BY MS. AVANT) I'm asking you questions about
your text messages.  You sent these messages, right?
You wrote these words, Mr. Park?

A.  Yes, ma'am.

Q.  Do you understand what being abusive means, Mr.
Park?

A.  I -- yeah -- I -- yes.

---

Q.  Do you think your statements on Park 61 are
abusive?

A.  I don't know if I could answer that.  I -- I
was stupid, and then I was really scared, and then she
set the stage.  It just too much to handle at the time.

Q.  So I'm going to read from Park 60 and Park 59.
I will tell you that I'm going to skip Ms. Freeman's
messages and just read yours.  And you state "I could
have forced upon you but I didn't.  You can hire a
lawyer and you can pay his retainer with your tits
because your cunts are out of order.  State has a dick.
So you have to -- you will have your day in court.  I am
loved too much and by too many people.  But I don't need
them.  I only needed your love and your cunt."

You said that to Ms. Freeman on April 2nd,
2022, correct?

A.  Yes.

Q.  Do you think those statements are abusive?

MR. LEE:  Objection.  Form.

A.  No, it sounds more desperate; not abusive.

Q.  (BY MS. AVANT)  These are desperate statements?

A.  Desperate for love.

Q.  Desperate by saying "I could have forced upon
you but I didn't, and you can hire a lawyer and you can
pay his retainer with your tits because your cunts are

---

out of order"?  Desperate for love by making light of
someone's medical condition?  That's how you show your
desperation for love?

A.  In this state, in my drunkenness, I wanted to
keep her from throwing everything away.  I wanted to
somehow -- because I felt she gonna -- I felt this was
it, so I wanted to stop that before we burned a bridge.
So whatever I said in that, I would not normally say
that, but I know I was drunk, really, really drunk,
because we were talking hours, texting hours, phone
tagging hours.  So the -- if I had a plan and a goal,
the goal was to not lose her.  But then, because of my
stupidity, I lost her.  I -- it doesn't make sense
but -- but that was it.  I wanted to keep her somehow,
amend -- fix it.  But instead, I...

Q.  You say "You can hire a lawyer and you can pay
his retainer with your tits."  You knew as of April 2nd,
2022, that your actions were potentially grounds for you
to be sued, correct?

MR. LEE:  Hold on.  If you're going to
answer a question like that, you need to read the rest
of it since she's only reading those portions that she
wants you to read.

A.  Yeah, I know.

MR. LEE:  You need to get the context, if

---

you know, before you provide any response to that
question.

A.  No.  I actually -- yes.  She was able to
really, really piss me off, and I got really upset.  And
she -- she knows the button to press and she did.  She
did a great job, and I was led on and -- so this thing's
mindless, just stupid, just stupid.  No intended harm,
even though she must be hurt.  But there was no
intention of trying to hurt her, no.

Q.  (BY MS. AVANT)  So my question was, as of
April 2nd, 2022, you knew that your actions were grounds
for Ms. Freeman to sue you?

MR. LEE:  Objection.  Don't respond to that
question.  Calls for a legal conclusion.

MS. AVANT:  It doesn't call for a legal
conclusion.

MR. LEE:  Yes, it does.  You could ask him
did you believe at the time.  That's fine.  But you
can't ask him if you knew she had a right to sue you.
You can't that.

Q.  (BY MS. AVANT)  Mr. Park, you state "You can
hire a lawyer and you can pay his retainer with your
tits."  Those are your words, right?

MR. LEE:  He said it is.  I mean, there is
no dispute there.

**[Page 208]**

1    MS. AVANT:  I don't need you to testify,
2  Bobby.
3          MR. LEE:  He's already answered it three
4  times.  Yes, he said that.
5          MS. AVANT:  Right.  And then you keep
6  messing up my questioning, and so I'm going to reask --
7          MR. LEE:  I'm not messing up your
8  questioning.
9          (Cross talk.)
10         THE REPORTER:  Wait.  I'm sorry --
11         MR. LEE:  I'm not messing up your
12  questioning.  You've asked him three times.  It's
13  borderline harassment.
14         MR. WISHNEW:  She hasn't --
15         MR. LEE:  Hold on.  You're not part of this
16  case.
17         (Cross talk.)
18         THE REPORTER:  I'm going off the record.
19         (Discussion off the record.)
20         THE REPORTER:  Back on.
21         MR. LEE:  All you got to do is say do you
22  believe that you had a right --
23         MS. AVANT:  I know what you want me to do,
24  but I don't have to do that.
25         MR. LEE:  No, because you're basically

**[Page 209]**

1  trying to get him to say this is against the law and
2  that is absolutely something I'm not going to allow to
3  happen --
4          MS. AVANT:  And if you --
5          MR. LEE:  Because it's a way to mismanage
6  this case in order to try to get something into the
7  record that's completely improper.  This is not a
8  lawyer.  I'm not going to allow him to be -- to be
9  harassed or put into a situation where he's completely
10  unable to answer a question.  And he cannot answer a
11  legal question; he's not a lawyer.
12         MS. AVANT:  Understood, Bobby, but there
13  are procedures in place, and I think the objection is
14  "form" because that's what we agreed to at the beginning
15  of this deposition.  You can state objections --
16         MR. LEE:  We can --
17         (Cross talk.)
18         MS. AVANT:  Bobby, I let you talk because
19  she can't get us both down, and I want to get this on
20  the record.
21         MR. LEE:  Oh, I thought we weren't on the
22  record.
23         MS. AVANT:  We're on the record and I want
24  to get this on the record for the judge.
25         MR. LEE:  I thought we were off the record.

**[Page 210]**

1  But go ahead.
2          MS. AVANT:  The procedure is objection,
3  form, if you think I'm asking a legal conclusion.  He
4  can then answer the question unless you instruct him not
5  to.  The court will then make a determination as to
6  whether my question is objection, form, and either
7  permit his answer or strike it from the record, and it
8  will not be part of it.  That is the way the procedures
9  work.  If you want to instruct him not to answer, that's
10  perfectly within your rights, but I get to ask him the
11  questions how I want to ask them.
12         MR. LEE:  Ms. Avant, that's what I did.
13         MS. AVANT:  That's not what you did.
14         MR. LEE:  I told -- I basically told you
15  I'm not going to allow him to answer the question
16  because it calls for a legal conclusion.  At that
17  particular point, you then asked him the same question
18  about did you write this thing about -- about the
19  breast, and he's already answered that three times.
20         MS. AVANT:  All right.  Because I have to
21  reestablish my basis for asking him a question because
22  you were forcing me to reask it.
23         MR. LEE:  Okay.  Go ahead.
24     Q.  (BY MS. AVANT)  Mr. Park, as of April 2nd,
25  2022, you understood that you could be sued by Ms.

**[Page 211]**

1  Freeman because of actions that took place prior to
2  April 2nd, 2022?
3      A.  Actually, no.  No, we're not -- no.  We weren't
4  that -- what's the word -- sound-minded.  No.  Did I
5  know?  Did I believe I could be sued?  No, no.  Maybe I
6  learn it from TVs.  Sue me if you can.  Those -- those
7  little jargons I picked up as I was growing up learning
8  English as a second language, ma'am.  So all this I
9  learned language that I picked up, and then I -- when I
10  got drunk and upset, I use those words without any
11  intent to hurt her.
12         It just -- it sounds so bad.  It makes me
13  look bad.  I get it.  It makes me really look bad, but
14  there is no intended will to hurt her or abuse her.  I'm
15  just scared that she gonna have sex with the guy that
16  night.  It says right there.  I got -- I -- I -- I got
17  obliterated by John when he came clean.  Now, that's
18  strike one against me, and then now she gonna do it
19  again with Mike.  I'm just going through my head.  My
20  love.  It's like my love could be doing it to me again?
21  I want to make sure.  I'm going nuts.  Crazy here,
22  ma'am.  She's spending the night with Mike away from
23  home financed by me.  Again, the money's not that
24  important.  Whether it's my money, her money, that's not
25  important, but that's a factor.  It's a fact.  I'm

1  paying for everything, everything for her, willingly,
2  voluntarily, lovingly, and then this happened.  So I
3  just want the truth.  Laurelaine, what's going on?  She
4  won't tell me.  And she would hang up.  So, ma'am, I
5  just went berserk.
6      Q.  Why did you --
7              MR. LEE:  Objection.  Nonresponsive.
8      Q.  (BY MS. AVANT)  Why did you tell her that you
9  could hire a lawyer?
10     A.  Huh?
11     Q.  Why did you say "You can hire a lawyer"?
12     A.  In drunkenness that's how Americans -- I learn
13 from TVs, you could just -- you throw those stupid
14 words.  Never thought that she would sue me.  Never
15 thought that she would actually bring lawsuit against
16 me.  Never.  So to answer your question, I'm sorry, I
17 did not know, I did not believe that I could be sued.
18     Q.  (BY MS. AVANT)  What do you mean when you say
19 the "State has a dick"?
20     A.  I'm being stupid.
21     Q.  There's no meaning behind that?
22     A.  Yeah.  I'm just being stupid.
23     Q.  You also -- when you say "I could have forced
24 upon you but I didn't," what do you mean by that
25 statement?

---

1      A.  Where is it again, ma'am?
2      Q.  On Park 60, line 232.
3      A.  Okay.  Yes.  Yes.  On the phone, off the phone,
4  she was -- she seemed defensive for John.  She did
5  something that made me feel like she was siding with
6  him.  So if you look at the text, you know, we are
7  referencing John here, and then I know that she told me
8  that John raped her.  John sends her pornography to her
9  children.  I mean, John did so much to her, she had to
10 skip apartment; call the cops.  So much going on with
11 this guy, and she was defending him.  So I said
12 stupid -- I said, you know, I did not rape you like him.
13 I'm just pleading, hey, I'm not that bad.  I'm not --
14 I -- at least I'm not that.  That's what I'm trying
15 to --
16     Q.  Did you fire Ms. Freeman because she was
17 spending the night with Mike on a trip that you paid
18 for?
19     A.  No.  No.  No.  When?  This time?
20     Q.  No, just in general, text messages aside.
21     A.  No.  No.  Again, understand, I will never fire
22 her unless she quits.  That -- even to this day, I will
23 never fire her.  Yes, I fired her for the day when she
24 didn't like, you know, the way I run the business and
25 she says that is not how you talk to the employees.  She

---

1  would be judgmental and very disrespectful.  Now, I'll
2  fire her for the day for the work related, but not
3  because -- not because she did not give me sex.  That is
4  just not true.
5      Q.  Do you dislike Americans?
6      A.  No, ma'am.
7      Q.  Do you think Americans are dumb?
8      A.  No, ma'am.
9      Q.  Do you think people in South Korea are smarter
10 than Americans?
11     A.  Oh, no.  No, ma'am.
12             THE REPORTER:  I need a minute.  Off the
13 record just a minute.
14             THE VIDEOGRAPHER:  Going off the record.
15 4:52 p.m.
16             (Break taken from 4:52 p.m. to 4:58 p.m.)
17             THE VIDEOGRAPHER: Going on the record at
18 4:58 p.m.
19     Q.  (BY MS. AVANT)  Mr. Park, do you remember
20 telling Ms. Freeman to quit being a fucking American?
21     A.  Yes.
22     Q.  Why did you say that to her?
23     A.  It was just general comment.  Again, a stupid
24 comment.  I said it to her.  I also say don't be a
25 stupid Korean.  I say that.  I just say those things.

---

1      Q.  Do you think Americans are stupid?
2      A.  No, ma'am.
3      Q.  What does being an American mean to you?
4      A.  When I said those things, I'm really talking
5  about the no-good side of Americans.  Every country has
6  a no-good side.  So I'm just talking generally, you
7  know, the dark side of Americans.
8      Q.  The dark side?
9      A.  No.
10     Q.  Or the dog side?
11     A.  Dark or, you know, bad side of Americans.  Like
12 every man has a dark side.  Every -- I'm just being
13 stupid, but I know that I believe in America and I love
14 America and I love American culture.  I just love
15 America, so I don't believe that, but I said that.  Why
16 did I say it?  Because I was stupid.  Again, drunk,
17 stupid.  I could live in Korea if I wanted to.  No, I'm
18 not going back because I love this country.  So I'm
19 sorry I said that, but I don't believe what I said.
20     Q.  Is the dark side of Americans different than
21 the dark side of Koreans?
22     A.  No.  What I mean is every country, every man,
23 their dark side.  So when I said don't be a stupid
24 American, don't be a stupid dark-side American.  Not
25 Black.  I'm not talking about dark in color.  You know,

**Page 224**

```
 1      Q.  Did you set up an LLC called Freeman
 2  Consulting, LLC, for Ms. Freeman?
 3      A.  I helped her, yes.
 4      Q.  And did you set that up so that her pay
 5  structure could be more like you're paid through your
 6  Knockout entities as opposed to paying her directly?
 7      A.  Okay.  There's context or background.
 8      Q.  Please.
 9      A.  She wanted to always build a career and we are
10  discussing how to help her build a career.  And she --
11  one day she wanted to be a business owner and I said
12  then this is the way to go.  You build your own
13  business, and by having your consulting, you could later
14  branch out, grow your business.  This is all for her for
15  the future.  And -- and we learn -- this is capitalism.
16  We learn that you build your assets, you build your
17  equity by having your own companies.  So this is a step
18  forward, not step backward.  So all good.
19      Q.  And as of the fall of 2019, the pay that Ms.
20  Freeman was receiving from Knockout, that was going
21  directly to Freeman Consulting, LLC, correct?
22      A.  Yes.
23      Q.  Knockout stopped paying Ms. Freeman directly at
24  that point, correct?
25      A.  Knockout -- what do you mean Knockout, ma'am?
```

---

**Page 225**

```
 1      Q.  The Knockout entity stopped paying Ms. Freeman
 2  directly; they stopped giving her a pay stub for
 3  Laurelaine Freeman and her pay was now being given to
 4  Freeman Consulting, LLC?
 5      A.  Yes.
 6      Q.  That's correct?
 7      A.  At some point, yes.
 8              (Deposition Exhibit 14 marked for
 9               identification.)
10      Q.  (BY MS. AVANT)  Please read Exhibit 14 and tell
11  me once you go through it.
12      A.  Yes.
13      Q.  What prompted you to send this apology email to
14  Ms. Freeman on December 14, 2021?
15      A.  As usual, she over -- what's the word.  She
16  accused me over beyond what I really did at Northwest
17  Highway.  I had a big incident there.  I try to fix it.
18  Along the way I made one girl uncomfortable.  I was
19  preaching with my hands up coming down.  I probably
20  brushed down the side of this -- this server lady, and
21  she told the GM she felt uncomfortable.  Immediately the
22  next day, or whenever she was available, I went out
23  there and apologized to her, but I wanted to do that in
24  front of the GM.  But Ms. Freeman blew that out of
25  proportion.  She thought I was out there doing something
```

---

**Page 226**

```
 1  behind her back or something.  She got so upset.  So I
 2  wanted to make a more formal because I never did what
 3  she imagined that I did, so I put this in writing.
 4          That's exactly what happened and that's what I
 5  did after.  She still believes to this day that -- that
 6  I deliberately made somebody uncomfortable.  No.  No.
 7  My -- my heart is with her.  There's no room for any
 8  other person, so I wanted to make that clear by writing
 9  this to her.  I -- I volunteer to write this to her.
10      Q.  Is it more plausible that Ms. Freeman was upset
11  as the human resources director that an employee was
12  coming to complain to her that you were harassing her?
13      A.  She could have been upset as human resources,
14  but she was also very upset as my -- my lover.
15      Q.  This --
16      A.  And then I'm trying to -- I'm trying to correct
17  my mistake formally, like a man.  Like, you know, I
18  wanted to -- handle shit at that point so I
19  wanted to make it more formal.
20      Q.  This incident in December of 2021, you were
21  belligerently drunk at the Northwest Highway location,
22  correct?
23      A.  I got to that point somewhat later, but it
24  takes a big incident for me to get there, and there was
25  a big incident.
```

---

**Page 227**

```
 1      Q.  I'm not understanding.  It took -- it takes a
 2  big incident for you to get belligerently drunk?
 3      A.  I -- I did not plan to do that when I went
 4  there, but then there was a huge incident.  It happens
 5  time to time, and I was allowed to drink more than I
 6  should and I got -- I got drunk.
 7      Q.  What incident happened?
 8      A.  It's a story.
 9      Q.  Tell me the story.
10      A.  Okay.  I went there to assess this general
11  manager, Victor, because somebody told me he left a
12  condom on the floor of the office, his office, and that
13  he was selling cocaine as a side business to the
14  customers.  Laurelaine Freeman knew that.  She told me,
15  "Angelo, you got to fire this guy."  So I took the time
16  to go out and assess the guy in the eyes.  And then
17  she -- he -- somehow in conversation with him, I decided
18  to give him one more chance to correct his ways.  At
19  that point, the girls from the bar comes to me saying,
20  "Angelo this customer, regular customer, left $2 tip on
21  a hundred of dollars tab," and they were upset.  They
22  wanted me to do something about the customer.  So I
23  looked.  It was a regular customer, husband and a wife.
24  I knew them.  So I called them out to the patio.  What
25  happened?  And they say, "Angelo, your girls, they don't
```

much I got to say this.

MR. LEE:  Objection.  Nonresponsive.

Q.  (BY MS. AVANT)  You also state -- or she stated "You abused me," and you said, "I know."  You understand that Ms. Freeman thought that you were abusing her?

A.  I want say -- I want to mention -- I want to reply in no uncertain terms:  I -- I just capitulated. Can you hear the tone?  I'm nervous.  I'm losing her. It sound like I'm about to go be executed, like I'm a dead man walking to be shot by the guard.  I'm stuttering and scared like hell.  I didn't -- I didn't want to lose her, even that morning.  I didn't want to lose her.  So when she said, "You abuse me," I just capitulated.  Okay.  I know, I know, I know.  I just wanted her back.  It's not me acknowledging, yes, I abused you.  I'm sorry.  No, it's not it.  I'm just saying okay, I know, I know.  Forgive me and come back. That's what I'm -- that's what I was that moment, ma'am. So don't use those words, you know, against me.  No.  I did not know that I was abusing her.  If she was feeling that way, I'm sorry, but that was not my intent.

And I have to say one more thing.  Now I know this is recorded.  She was recording me for purpose.  Oh, my God.  She was recording and she was leading me on.  The questions were leading me on to trap

---

me.  Now I know.  It's not an innocent conversation. It's all a planned conversation.  Detective trying to find a -- catch a, you know --

Q.  Here's a statement that wasn't entrapment.  You freely said, "I am stupid.  I am an asshole, and I am a criminal."  Why did you say those things to her?

A.  I'm face -- it's like a Jesus meeting.  That's how I talk.  I'm not trying to build me up.  I'm beating myself down.  I'm a criminal.  I went to jail.  What else did I say, ma'am?  I'm everything.

Q.  I'm stupid.

A.  I'm stupid.

Q.  I'm an asshole.

A.  I'm an asshole.  I'm just -- I'm completely asshole.  Sometimes I'm asshole.  I'm just being so -- It's a Jesus meeting with her so that I have a hope. When you repent, God forgive you.  I'm repenting.  It's a different level.

Q.  Again, you state to her, "I could have raped millions of girls but I didn't.  At least I didn't go that far."

A.  She was comparing me -- when I mentioned rape with her, it's because she would -- she would compare me to him or she would defend him and -- and in normal times, I understand.  You could defend him rightfully as

---

the father of the children.  But many times, she would defend him in the wrong place, and then I will stupid, immaturely mention that.  I did not rape.  I could have. I did not rape, but John did, you know.  It was stupid of me to say that but I wanted to clarify that at least. Laurelaine, I'm not that bad, you know.  Don't feel -- don't feel too low, you know.  I'm not that bad.  You did okay.  You did okay.  You know, I'm trying to console her in a way.  Hey, you did okay.  I'm not completely, you know, a loser.  So don't feel bad dating me, you know, that kind of thing.  Again, it's a -- it's patronizing but consoling.  It's complicated.

Q.  And you said that that phone conversation took place the morning after you sent the text messages that we reviewed, so that would have -- the phone conversation would have been April 3rd, 2022?

A.  Yes.

Q.  Okay.  Flip with me back to Exhibit 2, the white text messages.

A.  Yes.

Q.  And I'm going to page 357.  You there?

A.  Yes, ma'am.

Q.  And in the middle of the page starting on April 5th, 2022, at 10:57:15 a.m., there's a missed voice call.

---

A.  Yes.

Q.  And then you state "Did you call me?"

A.  Yes.

Q.  From there, going to page 358 to 359 to 360, all the way to 365, Ms. Freeman is not responding to your text messages, correct?  And you can take a second and look through them.

A.  Yes.  One second.  Did you call me?  And -- I missed a call, right, ma'am?

Q.  Correct.

A.  Missed a call from her?

Q.  I don't know.

A.  I'm -- I'm sure I could tell who called me, right?  So I must -- when I say missed -- yes.  She called me and I missed it.  Yeah.

Q.  So my question is, looking at 357 from the "Did you call me," through the end to 365, Ms. Freeman does not provide a written response to any of these text messages that you're sending her, correct?

A.  True.  Yes.

Q.  And so the first message is April 5th, 2022, and the last message is on page 365 is 4/16/2022; you see that?

A.  Uh-huh.

Q.  So for 12 days you talked to yourself; you

```
 1        IN THE UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF TEXAS
 2                  DALLAS DIVISION

 3   LAURELAINE FREEMAN,          )
                                  )
 4              Plaintiff,        )
                                  )
 5   VS.                          ) CIVIL ACTION
                                  )
 6                                ) NO.: 3:22-CV-2909-X
     YOUNG "ANGELO" C. PARK, et   )
 7   al.,                         )
                                  )
 8              Defendants.       )

 9

10            REPORTER'S CERTIFICATION

11     DEPOSITION OF YOUNG "ANGELO" C. PARK

12            NOVEMBER 15, 2023

13

14        I, Mindy E. Bressert, Certified Shorthand

15   Reporter in and for the State of Texas, hereby certify

16   to the following:

17        That the witness, YOUNG "ANGELO" C. PARK, was

18   duly sworn by the officer and that the transcript of the

19   oral deposition is a true record of the testimony given

20   by the witness;

21        I further certify that pursuant to FRCP Rule

22   30 (f) (1) that the signature of the deponent:

23        ___xx___ was requested by the deponent or a

24   party before the completion of the deposition and is to

25   be returned within 30 days from date of receipt of the
```

```
 1   transcript.  If returned, the attached Changes and

 2   Signature page contain any changes and the reasons

 3   therefor;

 4        _____ was not requested by the deponent or

 5   a party before the completion of the deposition.

 6        I further certify that I am neither counsel

 7   for, related to, nor employed by any of the parties or

 8   attorneys in the action in which this proceeding was

 9   taken, and further that I am not financially or

10   otherwise interested in the outcome of the action.

11        Subscribed and sworn to by me this 7th day of

12   December, 2023.

13

14

15                    _____
                      Mindy E. Bressert
16                    Texas CSR No. #11780
                      Expiration Date:  April 30, 2025
17                    Elite Deposition Technologies
                      Firm Registration No. 10110
18                    400 N. St. Paul Street
                      Suite 1340
19                    Dallas, Texas 75201
                      214.698.5199
20                    www.EliteDeps.com

21

22

23

24

25
```

**WORD INDEX**

**< $ >**
**$1,730** 256:24
**$10,000** 161:13
162:21
**$100** 140:12
**$1500** 15:12
**$16** 152:21 153:4, 21
155:6, 16 157:1
268:1
**$2** 227:20 228:4, 16
**$2.13** 233:7
**$20** 233:6
**$200,000** 68:21
**$300** 228:6, 7
**$300,000** 48:5 49:9
**$33,280** 153:22
**$4** 29:15 30:11, 15
31:9
**$40** 233:1, 17, 20
**$40,000** 154:3
**$400,000** 87:19, 20, 21
**$500** 252:12, 22
254:3
**$70** 13:20
**$700,000** 78:16
**$7964.40** 4:9
**$840.90** 255:1, 3

**< 0 >**
**00035** 4:11
**000560** 4:15
**000628** 5:11
**000629** 5:14
**001017** 5:13
**001034** 5:7
**001041** 5:8
**00167** 4:11
**00171** 4:23
**00302** 4:23
**00749** 5:4
**00752** 5:4
**00753** 5:6
**00756** 5:6
**025** 39:2, 14
**05** 39:14 51:8
**07** 12:6
**0h** 166:21

**< 1 >**
**1** 3:12 21:13, 14
272:22
**1,730** 257:12, 14, 18
**1,730.77** 257:15
**1.5** 75:12 78:6 82:5,
17 90:8 102:13
**1:21** 105:10, 12
**10** 4:7 28:15, 16
67:18, 19, 20 101:21
**10,000** 78:24 113:13
**10:09:38** 217:4
**10:11** 47:11, 12
**10:12:27** 141:21
**10:28** 47:12, 14
**10:38** 53:3, 4
**10:57:15** 238:24
**100** 50:14 82:17
**100:9, 19** 145:4
**179:18**
**101** 4:7
**10110** 273:17
**10th** 257:15
**11** 4:7 154:18, 21, 24
155:4
**11/15/2023** 270:2
**11/30/21** 217:4
**11:03** 53:4, 6
**11:36:09** 241:8, 20
**11:37:03** 241:12, 24
**1100** 35:24
**112** 50:25
**11445** 50:24 92:4
97:6
**11780** 273:15
**12** 4:9 13:12 196:19,
22 239:25 240:16, 18,
20 241:4
**12:07:50** 30:1
**12:30** 105:8, 9
**12:31:05** 242:18
**1201** 1:21 2:10
**13** 4:12, 15 2:20,
21 249:25 250:5
**1340** 273:18
**13th** 246:13 250:11

**14** 4:12, 14 225:8, 10,
14
**14th** 250:9, 20
**15** 1:12, 17 4:15
56:2 80:7 234:16, 20
246:6, 9, 12 249:4
272:12
**150,000** 81:3 91:6, 7
**1520** 73:1, 15
**154** 4:9
**15th** 6:3 22:13
24:16 188:19
**16** 4:21 153:11
248:11, 12, 14 249:7
116:5
**16th** 240:19 245:3
**17** 5:3 252:3, 6
253:10, 20 254:14
**1700** 2:4
**171** 248:17
**175** 248:21 249:10,
12
**178** 152:2
**17th** 257:17
**18** 5:3 101:19 117:5
162:23 252:6 253:5,
8, 11, 16, 24 254:18,
24 255:2
**19** 5:7 33:16 101:19
162:23 256:14, 15
257:24, 25
**196** 4:11
**1965** 22:13
**1980** 8:16
**1990** 7:12
**1996** 7:12
**1997** 12:8
**1997-ish** 12:13
**1998** 13:22
**1998/12/11** 23:7
**19-year-old's** 33:23
**1st** 24:17 25:2

**< 2 >**
**2** 3:3, 14 21:5 23:4
29:19, 22 141:15
178:17 188:13 217:3
238:18 263:15
**2.5** 108:2, 10
**2:33** 150:16, 17
**2:54** 150:17, 19

**20** 5:9 80:1 145:5
162:24 172:18 228:3
233:23 234:9 258:9
259:4, 5
**200,000** 68:22, 24
**2000** 101:4, 19
126:17 254:9, 11, 12
257:5 258:20
**2006** 12:6 14:5
**2008** 35:5
**2012** 15:20 17:11
**2014** 18:1
**2017** 38:2, 3 44:9
116:5
**2018** 38:7 40:9 56:2
62:16 63:12 66:4, 5,
21 70:12 97:11
122:14 128:5 146:12,
18 162:18, 20 165:13,
19, 24 166:17 194:18
251:5, 16
**2018-2020** 145:23
**2018-2022** 145:17
166:14
**2019** 4:12 20:10, 14,
19 21:1 24:4, 8 69:2,
4 72:1 83:1 117:17
168:25 224:19
**202** 46:20
**2020** 5:9 41:14 42:7
62:9 68:25 172:6
182:19, 23 183:4, 18
256:19, 25 258:7
**2021** 4:14 29:14
31:8 42:8 52:25
53:10, 14, 18 68:15,
19 86:19 88:14 92:2
101:6, 9 185:5
232:14 256:20 258:6
**2021-2022** 41:8
**2021-ish** 162:24
**2022** 4:15 95:3, 6, 7,
12, 18, 21 96:1, 9, 24
97:11 98:3 114:2
116:4 128:6 146:13,
18, 22, 24 148:7
149:1, 9, 16 163:1, 3
165:14, 20, 24 166:17
172:20, 21 173:1, 7
174:20, 24 184:4, 19

**258** 5:13
**259** 5:11
**26** 33:7
**260** 51:14
**266** 3:6
**27** 178:9
**270** 3:7
**2700** 35:14 85:16
86:3
**273:12** 273:17
**28** 44:9
**29** 3:14 79:10
**2nd** 198:12 203:20
204:2 205:15 206:17
207:11 210:24 211:2

**< 3 >**
**3** 3:14 5:9 22:25
23:1 43:24 44:2
92:5 102:5 111:10
178:23
**3,000** 199:3
**3:22-CV-2909-X** 1:6
272:6
**3:31:42** 242:6
**3:33:58** 188:19
**30** 49:12 67:14, 17,
20 79:3, 14 98:12
99:2 101:12 103:17
104:3 172:14 272:22,
23 273:16
**300,000** 49:20
**30-day** 235:16, 20
**306** 62:16 162:18,
20
**31st** 24:17 25:1
**350,000** 79:23
**36** 186:14, 15
**357** 238:21 239:16
241:4
**358** 239:4
**359** 239:4
**360** 239:4
**360,000** 80:10
**363** 242:12
**364** 240:24 263:15,
18
**365** 239:5, 17, 22

**3rd** 92:2 238:16
257:14

**< 4 >**
**4** 3:16 30:5 50:21,
24 53:8 56:1
**4:13** 249:22
**4/16/2022** 239:22
240:21 242:18 264:3
**4/16/22** 263:20
**4/20/2022** 254:25
**4/5/2022** 240:21
**4:00** 192:21, 22
**4:17** 192:22, 24
**4:52** 214:15, 16
**4:58** 214:16, 18
**44** 39:11 58:7 153:21
154:5, 7 233:22, 23
**400** 273:17
**400,000** 80:20 88:3
**4/16/22** 263:20
**43** 3:16
**45** 172:15
**4601** 93:8
**48** 58:9
**4th** 70:12 253:14
254:5, 6, 7

**< 5 >**
**5** 3:18 61:11 62:11,
14 72:7, 18 74:23
116:7 162:17
**5/13** 249:23
**5/14/2022** 249:1, 17
**5/3/21** 141:20
**5/7** 246:2, 3
**50** 3:18 98:12 99:2,
18
**50,000** 58:1
**500** 252:23 253:1
254:6, 7, 8
**50497385** 21:22
**5250** 2:11
**59** 205:6
**5th** 238:24 239:21

**240:19** 245:2

**< 6 >**
**6** 3:4, 5, 20 66:1, 4
74:17 96:22
**6:05** 246:3, 5
**6:35** 1:18 269:21, 22
**60** 205:6 213:2
**60,000** 58:5
**61** 197:2, 3, 6, 7, 8, 9,
12 201:11 205:1
**62** 3:20
**66** 3:22

**< 7 >**
**7** 3:24 70:8, 11 74:3,
6
**7.5** 81:8
**70** 3:25 67:15
**73** 4:4
**7336** 5:3
**75** 249:12
**75201** 2:5 273:18
**75229** 50:25
**75270** 2:11
**7th** 273:17

**< 8 >**
**8** 4:3 9:25 73:2, 5
82:18
**8/17/2019-3/26/21** 4:9
**8/4/21** 30:1
**80** 43:12 90:8
**802801938** 3:16
**802907235** 3:18
**80292185** 3:22
**803021605** 3:22
**803134407** 3:24
**803341044** 4:3
**804095080** 4:5
**84** 43:12
**84,000** 255:10
**85** 75:13
**8600** 36:7

**< 9 >**
**9** 4:5 9:25 20:22, 24
21:5 91:21, 24 97:9
**9:04:35** 263:21

**189:7** 194:18 198:13
203:20 204:3 205:16
206:18 207:11
210:25 211:2 238:16,
24 239:21 245:2, 3
246:13 250:21 251:5,
16 255:4
**2023** 1:12, 17 6:3
86:12 87:5 88:15
95:2 107:2 272:12
273:12
**2025** 273:16
**21** 3:13 5:12 33:16
68:17, 20 117:20
172:18 178:23 258:2,
3, 8
**214.481.8881** 2:12
**214.602.6551** 2:6
**214.698.5100** 2:12
**214.698.5199** 273:19
**214.698.5200** 2:6
**214-422-8804** 37:19
**215** 178:22
**217** 141:18
**21st** 66:4
**21-year-old's** 33:21
**22** 5:14 95:10
117:21 173:19
188:19 260:14, 17
**2212** 26:5
**223** 4:13
**225** 4:15
**22nd** 240:20
**23** 33:16
**231** 213:2
**234** 4:15
**235** 29:23
**2385** 5:5
**2390** 2:5
**23-year-old's** 33:19
**24** 9:3 197:14
215:5, 16, 23
**246** 4:21
**248** 4:23
**250,000** 80:4 91:5
**252** 5:11
**253** 5:6
**256** 5:8
**2560** 46:20

**258** 5:13
**259** 5:11
**26** 33:7
**260** 51:14
**266** 3:6
**27** 178:9
**270** 3:7
**2700** 35:14 85:16
86:3
**273:12** 273:17
**28** 44:9
**29** 3:14 79:10
**2nd** 198:12 203:20
204:2 205:15 206:17
207:11 210:24 211:2

**< 3 >**
**3** 3:14 5:9 22:25
23:1 43:24 44:2
92:5 102:5 111:10
178:23
**3,000** 199:3
**3:22-CV-2909-X** 1:6
272:6
**3:31:42** 242:6
**3:33:58** 188:19
**30** 49:12 67:14, 17,
20 79:3, 14 98:12
99:2 101:12 103:17
104:3 172:14 272:22,
23 273:16
**300,000** 49:20
**30-day** 235:16, 20
**306** 62:16 162:18,
20
**31st** 24:17 25:1
**350,000** 79:23
**36** 186:14, 15
**357** 238:21 239:16
241:4
**358** 239:4
**359** 239:4
**360** 239:4
**360,000** 80:10
**363** 242:12
**364** 240:24 263:15,
18
**365** 239:5, 17, 22

**3rd** 92:2 238:16
257:14

**< 4 >**
**4** 3:16 30:5 50:21,
24 53:8 56:1
**4:13** 249:22
**4/16/2022** 239:22
240:21 242:18 264:3
**4/16/22** 263:20
**4/20/2022** 254:25
**4/5/2022** 240:21
**4:00** 192:21, 22
**4:17** 192:22, 24
**4:52** 214:15, 16
**4:58** 214:16, 18
**44** 39:11 58:7 153:21
154:5, 7 233:22, 23
**400** 273:17
**400,000** 80:20 88:3
**4/16/22** 263:20
**43** 3:16
**45** 172:15
**4601** 93:8
**48** 58:9
**4th** 70:12 253:14
254:5, 6, 7

**< 5 >**
**5** 3:18 61:11 62:11,
14 72:7, 18 74:23
116:7 162:17
**5/13** 249:23
**5/14/2022** 249:1, 17
**5/3/21** 141:20
**5/7** 246:2, 3
**50** 3:18 98:12 99:2,
18
**50,000** 58:1
**500** 252:23 253:1
254:6, 7, 8
**50497385** 21:22
**5250** 2:11
**59** 205:6
**5th** 238:24 239:21

**240:19** 245:2

**< 6 >**
**6** 3:4, 5, 20 66:1, 4
74:17 96:22
**6:05** 246:3, 5
**6:35** 1:18 269:21, 22
**60** 205:6 213:2
**60,000** 58:5
**61** 197:2, 3, 6, 7, 8, 9,
12 201:11 205:1
**62** 3:20
**66** 3:22

**< 7 >**
**7** 3:24 70:8, 11 74:3,
6
**7.5** 81:8
**70** 3:25 67:15
**73** 4:4
**7336** 5:3
**75** 249:12
**75201** 2:5 273:18
**75229** 50:25
**75270** 2:11
**7th** 273:17

**< 8 >**
**8** 4:3 9:25 73:2, 5
82:18
**8/17/2019-3/26/21** 4:9
**8/4/21** 30:1
**80** 43:12 90:8
**802801938** 3:16
**802907235** 3:18
**80292185** 3:22
**803021605** 3:22
**803134407** 3:24
**803341044** 4:3
**804095080** 4:5
**84** 43:12
**84,000** 255:10
**85** 75:13
**8600** 36:7

**< 9 >**
**9** 4:5 9:25 20:22, 24
21:5 91:21, 24 97:9
**9:04:35** 263:21

# TEXAS SECRETARY of STATE
# JANE NELSON



DEPOSITION
EXHIBIT
3
11.15.23 MB

### BUSINESS ORGANIZATIONS INQUIRY - VIEW ENTITY

| | | | |
|---|---|---|---|
| **Filing Number:** | 802801938 | **Entity Type:** | Domestic Limited Liability Company (LLC) |
| **Original Date of Filing:** | August 28, 2017 | **Entity Status:** | In existence |
| **Formation Date:** | N/A | | |
| **Tax ID:** | 32064703237 | **FEIN:** | |
| **Duration:** | Perpetual | | |

| | |
|---|---|
| **Name:** | Knockout Sports Bar, LLC |
| **Address:** | 2212 W NORTHWEST HWY |
| | DALLAS, TX 75220 USA |

| REGISTERED AGENT | FILING HISTORY | NAMES | MANAGEMENT | ASSUMED NAMES | ASSOCIATED ENTITIES | INITIAL ADDRESS |
|---|---|---|---|---|---|---|
| **Last Update** | **Name** | | **Title** | **Address** | | |
| April 24, 2023 | MYOUNG S PARK | | MANAGING MEMBER | 2560 ROYAL LANE 202 DALLAS, TX 75229 USA | | |
| April 24, 2023 | MYOUNG S PARK | | DIRECTOR | 2560 ROYAL LANE 202 DALLAS, TX 75229 USA | | |

[ Order ]   [ Return to Search ]

Instructions:
- To place an order for additional information about a filing press the 'Order' button.

# TEXAS SECRETARY of STATE
## JANE NELSON



### BUSINESS ORGANIZATIONS INQUIRY - VIEW ENTITY

| | | | |
|---|---|---|---|
| **Filing Number:** | 802907435 | **Entity Type:** | Domestic Limited Liability Company (LLC) |
| **Original Date of Filing:** | January 15, 2018 | **Entity Status:** | In existence |
| **Formation Date:** | N/A | | |
| **Tax ID:** | 32065934476 | **FEIN:** | |
| **Duration:** | Perpetual | | |

| | |
|---|---|
| **Name:** | KOSB Deep Ellum, LLC |
| **Address:** | 11445 EMERALD ST STE 112 |
| | DALLAS, TX 75229-7315 USA |

REGISTERED AGENT    FILING HISTORY    NAMES    MANAGEMENT    ASSUMED NAMES    ASSOCIATED ENTITIES    INITIAL ADDRESS

| Last Update | Name | Title | Address |
|---|---|---|---|
| April 9, 2023 | SANG HAN | MEMBER | 2560 ROYAL LN 216 DALLAS, TX 75229 USA |
| April 9, 2023 | SANG HAN | DIRECTOR | 2560 ROYAL LN 216 DALLAS, TX 75229 USA |

[ Order ]    [ Return to Search ]

Instructions:
- To place an order for additional information about a filing press the 'Order' button.

# TEXAS SECRETARY of STATE
# JANE NELSON



| | |
|---|---|
| **Filing Number:** | 802921543 |
| **Original Date of Filing:** | January 30, 2018 |
| **Formation Date:** | N/A |
| **Tax ID:** | 32066098594 |
| **Duration:** | Perpetual |

| | |
|---|---|
| **Entity Type:** | Domestic Limited Liability Company (LLC) |
| **Entity Status:** | In existence |
| **FEIN:** | |

**Name:** KOSB Arlington, LLC
**Address:** 11445 EMERALD ST STE 112
DALLAS, TX 75229-7315 USA

| REGISTERED AGENT | FILING HISTORY | NAMES | MANAGEMENT | ASSUMED NAMES | ASSOCIATED ENTITIES | INITIAL ADDRESS |
|---|---|---|---|---|---|---|

| Last Update | Name | Title | Address |
|---|---|---|---|
| April 9, 2023 | MYUNG PARK | MANAGER | 2560 ROYAL LN 216 DALLAS, TX 75229 USA |

[ Order ]  [ Return to Search ]

Instructions:
- To place an order for additional information about a filing press the 'Order' button.

APP.0047

# TEXAS SECRETARY of STATE
# JANE NELSON



## BUSINESS ORGANIZATIONS INQUIRY - VIEW ENTITY

| | | | |
|---|---|---|---|
| **Filing Number:** | 803021605 | **Entity Type:** | Domestic Limited Liability Company (LLC) |
| **Original Date of Filing:** | May 21, 2018 | **Entity Status:** | In existence |
| **Formation Date:** | N/A | | |
| **Tax ID:** | 32067246820 | **FEIN:** | |
| **Duration:** | Perpetual | | |

| | |
|---|---|
| **Name:** | DN - KO THE COLONY, LLC |
| **Address:** | 12801 N CENTRAL EXPY STE 260 |
| | DALLAS, TX 75243-1874 USA |

| REGISTERED AGENT | FILING HISTORY | NAMES | MANAGEMENT | ASSUMED NAMES | ASSOCIATED ENTITIES | INITIAL ADDRESS |
|---|---|---|---|---|---|---|
| **Last Update** | **Name** | | **Title** | **Address** | | |
| November 5, 2023 | ALEXANDER NUGUYEN | | MANAGER | 8330 LBJ FREEWAY 550 DALLAS, TX 75243 USA | | |
| November 5, 2023 | ALEXANDER NUGUYEN | | DIRECTOR | 8330 LBJ FREEWAY 550 DALLAS, TX 75243 USA | | |
| November 5, 2023 | MICHAEL DINH | | MANAGER | 8330 LBJ FREEWAY 550 DALLAS, TX 75243 USA | | |

[ Order ]   [ Return to Search ]

---

Instructions:
- To place an order for additional information about a filing press the 'Order' button.

**TEXAS SECRETARY of STATE**
**JANE NELSON**



## BUSINESS ORGANIZATIONS INQUIRY - VIEW ENTITY

| | | | |
|---|---|---|---|
| **Filing Number:** | 803134407 | **Entity Type:** | Domestic Limited Liability Company (LLC) |
| **Original Date of Filing:** | October 4, 2018 | **Entity Status:** | In existence |
| **Formation Date:** | N/A | | |
| **Tax ID:** | 32068562027 | **FEIN:** | |
| **Duration:** | Perpetual | | |

**Name:** KOSB Addison LLC
**Address:** 11445 EMERALD ST STE 112
Dallas, TX 75229-7315 USA

| REGISTERED AGENT | FILING HISTORY | NAMES | MANAGEMENT | ASSUMED NAMES | ASSOCIATED ENTITIES | INITIAL ADDRESS |
|---|---|---|---|---|---|---|
| **Last Update** | **Name** | | **Title** | **Address** | | |
| April 9, 2023 | MYUNG PARK | | MANAGER | 2560 ROYAL LN 216 DALLAS, TX 75229 USA | | |
| April 9, 2023 | MYUNG PARK | | DIRECTOR | 2560 ROYAL LN 216 DALLAS, TX 75229 USA | | |

Order   Return to Search

**Instructions:**
- To place an order for additional information about a filing press the 'Order' button.



# TEXAS SECRETARY of STATE
# JANE NELSON

### BUSINESS ORGANIZATIONS INQUIRY - VIEW ENTITY

| | | | |
|---|---|---|---|
| **Filing Number:** | 803341044 | **Entity Type:** | Domestic Limited Liability Company (LLC) |
| **Original Date of Filing:** | June 11, 2019 | **Entity Status:** | In existence |
| **Formation Date:** | N/A | | |
| **Tax ID:** | 32071024635 | **FEIN:** | |
| **Duration:** | Perpetual | | |

**Name:**       KOSB Arlington Arena, LLC
**Address:**    2560 ROYAL LN STE 216
                Dallas, TX 75229-3462 USA

| REGISTERED AGENT | FILING HISTORY | NAMES | MANAGEMENT | ASSUMED NAMES | ASSOCIATED ENTITIES | INITIAL ADDRESS |
|---|---|---|---|---|---|---|

| Last Update | Name | Title | Address |
|---|---|---|---|
| February 19, 2022 | YOUNG PARK | MANAGER | 2560 ROYAL LN #216<br>DALLAS, TX 75229 USA |
| February 19, 2022 | YOUNG PARK | DIRECTOR | 2560 ROYAL LN #216<br>DALLAS, TX 75229 USA |
| October 27, 2023 | Sang W Han | Manager | 2700 Old Denton Rd., Ste 1012<br>Carrollton, TX 75007 USA |

Order    Return to Search

Instructions:
- To place an order for additional information about a filing press the 'Order' button.



# TEXAS SECRETARY of STATE
# JANE NELSON

### BUSINESS ORGANIZATIONS INQUIRY - VIEW ENTITY

| | | | |
|---|---|---|---|
| **Filing Number:** | 804095080 | **Entity Type:** | Domestic Limited Liability Company (LLC) |
| **Original Date of Filing:** | June 3, 2021 | **Entity Status:** | In existence |
| **Formation Date:** | N/A | | |
| **Tax ID:** | 32079563410 | **FEIN:** | |
| **Duration:** | Perpetual | | |

| | |
|---|---|
| **Name:** | KOSB Fort Worth LLC |
| **Address:** | 11445 EMERALD ST STE 112 |
| | DALLAS, TX 75229-7315 USA |

| REGISTERED AGENT | FILING HISTORY | NAMES | MANAGEMENT | ASSUMED NAMES | ASSOCIATED ENTITIES | INITIAL ADDRESS |
|---|---|---|---|---|---|---|
| **Last Update** | **Name** | | **Title** | | **Address** | |
| August 21, 2022 | MYUNG PARK | | MEMBER | | 4601 BYRON CIR | |
| | | | | | IRVING, TX 75038 USA | |

[ Order ]   [ Return to Search ]

Instructions:
- To place an order for additional information about a filing press the 'Order' button.

| | |
|---|---|
| **From:** | Visiting Angel |
| **To:** | laurelainepage@gmail.com |
| **Subject:** | I AM SORRY |
| **Date:** | Tuesday, December 14, 2021 11:38:40 PM |



Laurelaine,

I'm sorry I broke the promise again.
I promised not to drink at KO but I did it again.
I hurt you again as soon as you allowed me to get close to you.

I also apologize for causing the human resource fiasco with the girls at NW.
I will apologize to them in person in time because I made them feel the way they said they did.
But there were no intended sexual advances of any kind whatsover.
Deep down, I trust they know that too.
Regardless, I will apologize to them.

Please accept my apology but do not forgive.
I don't deserve it.

But please allow me to accomplish my mission.
I made it my mission to care for your health and that of your girls.
I made it my business to help you achieve your financial independence.
I made it my lifetime goal to make you happy.

So far, I have done none of the above.
So, please allow me to accomplish my mission, conduct my business and achieve my goal, starting this week.

Please call me.
I will await your call.


--
Angelo Park
Visiting Angel
Tel: 214-422-8804

Happy moments, praise God.
Difficult moments, seek God.
Quiet moments, worship God.
Painful moments, trust God.
Every moment, thank God.

REMEMBER: If God brings you to it, He will bring you through it.

FREEMAN 000560
APP.0052

```
 1              UNITED STATES DISTRICT COURT

 2               NORTHERN DISTRICT OF TEXAS

 3                    DALLAS DIVISION

 4    _____

 5    LAURELAINE FREEMAN,

 6              Plaintiff,

 7        v.                        Civil Action No.

 8    YOUNG "ANGELO" C. PARK, KNOCKOUT   3:22-CV-2909-X

 9    SPORTS BAR LLC, KOSB ADDISON LLC

10    DBA KNOCKOUT SPORTS BAR, KOSB

11    ARLINGTON ARENA LLC DBA

12    KNOCKOUT SPORTS BAR AND

13    KNOCKOUT SPORTS ARENA, KOSB

14    ARLINGTON DBA KNOCKOUT SPORTS BAR,

15    KOSB DEEP ELLUM LLC DBA

16    KNOCKOUT SPORTS BAR, KOSB FORTH

17    WORTH LLC DBA KNOCKOUT SPORTS

18    BAR, DN-KO THE COLONY LLC

19    DBA KNOCKOUT SPORTS BAR,

20              Defendants.

21    _____

22

23

24

25

                                          Page 1
```

APP.0053

```
 1                        under applicable procedural and
 2                        evidentiary rules and laws in the same
 3                        manner as a deposition recorded by
 4                        stenographic means; and
 5                        - shall constitute written stipulation
 6                        of such.
 7                        At this time will everyone in
 8         attendance please identify yourself for the record,
 9         beginning from my left to my right.
10                        MS. AVANT:  Camille Avant for Plaintiff
11         Laurelaine Freeman.
12                        MR. LEE:  Bobby Lee for defendants.
13                        THE REPORTER:  Thank you.
14                        Hearing no objection, I will now swear
15         in the witness.
16                        Please raise your right hand.
17         WHEREUPON,
18                            VICTOR BORREGO,
19         called as a witness, and having been first duly sworn
20         to tell the truth, the whole truth, and nothing but
21         the truth, was examined and testified as follows:
22                        THE REPORTER:  You may proceed.
23                            EXAMINATION
24         BY MS. AVANT:
25              Q    Will you please state your name for the
```

```
 1    record?

 2         A    Victor Borrego.

 3         Q    Would you please spell your last name,

 4    please?

 5         A    B-O-R-R-E-G-O.

 6         Q    Have you given your deposition before?

 7         A    Earlier -- no, wait.

 8         Q    A deposition is this, today.

 9         A    Oh, yeah.  No.

10         Q    Okay.  I'm going to hand you what's been

11    marked as Exhibit 1.

12                   (Exhibit 1 was marked for

13                    identification.)

14              Did you receive a copy of the subpoena?

15         A    Yes, ma'am.

16         Q    Do you understand that you're giving your

17    testimony here pursuant to this subpoena?

18         A    Yes, ma'am.

19         Q    In the deposition today, I'm going to ask

20    you a series of questions.  And just like you're doing

21    today, I need you to answer yes or no and give verbal

22    responses.  Do you understand that?

23         A    Yes, ma'am.

24         Q    She's taking down everything that you and I

25    say, so in order to do that, if you say uh-uh, uh-huh,
```

Page 8

```
 1      or do any type of head nod, she can't necessarily

 2      transcribe that.  Do you understand that?

 3           A    Yes, ma'am.

 4           Q    Do you understand that you're under oath

 5      today?

 6           A    Yes, ma'am.

 7           Q    If I ask you a question, is it fair to say

 8      that you understood what I've asked you?  If I ask you

 9      a question and you answer, is it fair to say that you

10      understood what I asked you?

11           A    Yes, ma'am.

12           Q    If I ask you a question and you don't

13      understand, will you please ask me to rephrase or

14      re-ask my question so that you can understand what I'm

15      asking?

16           A    Yes, ma'am.

17           Q    Were you previously employed by Knockout

18      Sports Bar?

19           A    Yes, ma'am.

20           Q    Do you remember the physical address

21      location of the Knockout that you worked for?

22           A    Not the whole address, but I'm working at

23      Northwest Highway.

24           Q    The Northwest Highway location?

25           A    Yes, and I help out in Addison.
```

Veritext Legal Solutions
800-336-4000

APP.0056

1      Q     Did you work for any other location?

2      A     No.  No, ma'am.

3      Q     What were your dates of employment?

4      A     September 2021 to March 2022.

5      Q     September 2021 to March 2022?

6      A     Yes, ma'am.  I think it was August.

7      Q     About six months?

8      A     Eight months.  I might be off on the start

9    date 'cause I know I left my other job to go work

10   there, but I was working at both jobs as a GM at my

11   other job and a GM at Knockout, so it was crazy.  But

12   I think it was September.  I have my resume.  I can

13   look in my resume.

14     Q     Do you think you were employed there eight

15   months, you said?

16     A     Mm-hmm.

17     Q     Okay.  Are you for certain that your end

18   date was in March?

19     A     Yes, that, for sure I do know.

20     Q     So if we count back eight months from March,

21   I think that puts you in March?

22     A     Mm-hmm.  That's why I was thinking it was

23   August.  I apologize.

24     Q     No, that's fine.  Were you an employee or

25   independent contractor?

Page 10

1    and then be up.  One time, he jumped on the bar and

2    was dancing.  He would always disappear to the parking

3    lot.

4         Q    Do you think he was doing cocaine with the

5    customers?

6         A    I believe so, but I'm not 100 percent.

7         Q    Where do you form that belief from?

8         A    Just customers would walk in, sit at the

9    bar.  He'd go up to them, talk and then disappear and

10   then come back.

11        Q    Did you guys have a system between the

12   stores or the general managers to alert each other if

13   Angelo was drunk?

14        A    Yes.

15        Q    What was that system?

16        A    System was, if he calls after 7, you didn't

17   answer, and if he shows up at the store, do not let

18   him drink.  It's kind of hard 'cause he's -- and to

19   keep staff members away.

20        Q    Why would you want to keep staff members

21   away from him?

22        A    Because he was drunk and I guess to protect

23   him from doing anything dumb to them, stupid to them.

24        Q    What kind of dumb and stupid things were you

25   concerned that Angelo would do to them?

Page 30

```
 1          A     Touch the girls inappropriately when they
 2     don't want to be touched or make comments.  Just
 3     negative situations.
 4          Q     Have you personally seen him touch girls
 5     inappropriately or make comments towards them?
 6          A     Yes, ma'am.
 7          Q     Can you describe those incidents to me?
 8          A     Like, a situation that happened?
 9          Q     Yes.
10          A     There was one time I had brought a future
11     manager for interview.  Angelo interviewed her, was
12     sitting in the patio, interviewing her.  After the
13     interview was done, he offered me a drink.  I told him
14     no, but then I decided to have one with him, and that
15     was it.  Also I had to let the bartender know not to
16     make it normal, to make mine weak.  After that, he
17     stayed a few hours later.  He was intoxicated.  He
18     goes behind the bar and her name was Taylor, Taylor
19     English.  He touches Taylor English towards the back
20     and runs his hand -- this is what she told me -- runs
21     his hand towards her bottom.  Then he goes up to Myra
22     Smith.
23                    MR. LEE:  I'm sorry, I didn't
24     understand what you said.
25                    THE WITNESS:  Oh.  Myra Smith.  Myra.
```

Page 31

APP.0059

```
 1     BY MS. AVANT:

 2          Q    Mariah?

 3          A    Mariah Smith.  Doesn't do anything with her

 4     because he has an -- he sees her, looks at her really

 5     mean, and then he goes up to Alexia and then caresses

 6     her back.  And then he goes up to our servers, Alma,

 7     Jessica, and Jackie and starts touching their back.

 8     When I found this out, I went to the office to speak

 9     to Robert, and Taylor was in the office crying and

10     letting them know what happened.

11               After that, I didn't know what he was doing

12     in the front.  I told them that I noticed that he

13     calls the cooks and they're sitting on the wall.  He

14     offers them Dos Equis, and then hd goes up to one of

15     the cooks and starts trying to kiss them on the neck.

16     And the cook pushes him away like he was about to beat

17     him up.  And then after that, I had him sit down at

18     the bar, trying to calm him down.  And then he gets

19     mad at me for having Mariah Smith behind the bar

20     because she's Black and she shouldn't be behind the

21     bar.

22               MR. LEE:  Can you do me a favor?  Your

23     voice is going down low, and I can barely hear you.

24     BY MS. AVANT:

25          Q    If you can just talk louder.
```

Page 32

APP.0060

1          A     Yes.

2          Q     Was that the end of your statement?  I would

3     like you to finish.  I don't want you to be cut off.

4          A     So he gets upset with me for having Mariah

5     Smith behind the bar because she's Black and she

6     shouldn't be behind the bar.  After that, the night

7     progresses, then he starts hanging out with customers.

8     And the customers are asking me what's wrong with him

9     because they saw what he did to the females.

10              One of my managers, Andrew Lawson, he ends

11     up quitting 'cause he sees what Angelo's doing.  Larry

12     Miller ends up -- Andrew walked out.  Larry Miller is

13     about to walk out.  I ask both of them to come back.

14     I have to call Andrew to come back to help me.  Larry

15     tells me he has my back.  So I'm dealing with Angelo,

16     and I'm getting upset with him because of what he's

17     doing to my staff.

18              We had people walk out of the situation.

19     Later on towards the night, I have Angelo still

20     sitting at the bar still, not trying to let him go

21     anywhere.  Then he gets upset with me and tells me

22     he's going to shoot my son.  My son is a bar back

23     there.  His name is Brandon Borrego.  I didn't know he

24     carries a gun with him, but he threatened to shoot my

25     son because I was disrespecting him in his restaurant,

                                          Page 33

APP.0061

1      in his store.  Then he calls the security guard over

2      and starts telling him 'cause it was closing time.

3      We're getting people out the door, trying to get

4      people out the door so we can get him out the door.  I

5      had the staff go to the kitchen, hide in the office.

6      A lot of managers are cashing them out.  He calls the

7      security guard and starts telling the security guard,

8      calling them names and telling them he could fire

9      them.  The security guard didn't do anything wrong.

10             So then I finally was able to get him into

11     his vehicle.  Everybody disappears.  Like, everybody

12     left.  Everybody's hiding in their cars.  We're not

13     done with the shift.  There's money still not being

14     counted.  Finally had him get in his vehicle for him

15     to leave.  I guess I can't ask him if he needs a ride

16     home or call an Uber 'cause they get offended 'cause

17     he's not drunk, but he was really intoxicated.  He

18     finally left, and then I found out all through the

19     stores, what he did with the girls and how he touched

20     the girls and girls wanted to quit.  Kitchen staff

21     just got mad because they don't have papers, so they

22     feel like they got to deal with this.  It was just

23     chaos.  I had to hide my son because I didn't know

24     what he actually was going to do when he went to his

25     car.

Page 34

APP.0062

```
 1            Q    You said a lot, so I just want to unpack a
 2       lot of what you said.  Do you have a timeframe of when
 3       this event took place?
 4            A    So from 5 to closing, and it was a Friday,
 5       so he didn't leave until probably almost 3.
 6            Q    So 5 p.m. to 3 a.m.?
 7            A    Mm-hmm.
 8            Q    Do you remember the day?
 9            A    I do not.
10            Q    Do you remember the month?
11            A    It was sometime in December.
12            Q    December 2021?
13            A    Yes.
14            Q    The future manager that you were
15       interviewing, do you remember who that was?
16            A    Yes, her name was Liz, Elizabeth.  I don't
17       know her last name, but yes.
18            Q    Was she present when all this took place?
19            A    No, she left.  But she did watch the cameras
20       'cause she wanted to see what she was getting herself
21       into.  And then mysteriously, the cameras stopped
22       working.
23            Q    She wanted to see the cameras after she was
24       hired?
25            A    Mm-hmm.  So we showed her the cameras a week
```

Page 35

1      later.   She did take notes about it on her notepad.

2          Q     Do you know if she still works at Knockout?

3          A     No, she left way before that.

4          Q     And you said the cameras were mysteriously

5      gone?

6          A     Yes.   I think her name is Jamie.   She's been

7      with the company forever.   Also Robert was there that

8      night too.   Robert saw what happened and watched the

9      cameras with Liz.

10                     MR. LEE:   I'm sorry, I didn't

11     understand that last part.

12                     THE WITNESS:   Oh, Robert was a manager

13     there too.   He was there that night.   And then also he

14     watched the cameras with Elizabeth when she was

15     watching the cameras.   Jamie's been with the company

16     for a long time, and when she got sent to the store,

17     Robert told me that she was back there looking at the

18     cameras, and then the cameras -- we weren't able to

19     access the cameras anymore.

20     BY MS. AVANT:

21         Q     How soon after the incident did you watch

22     the cameras?

23         A     Probably two weeks after.

24         Q     And who all was watching the camera footage?

25         A     I was present, Robert, Elizabeth, and

                                              Page 36

APP.0064

1    Skylar.

2         Q    Skylar?

3         A    Yes.

4         Q    Do you know Skylar's last name?

5         A    I do not.

6         Q    And what was the purpose of going back and

7    watching the video footage?

8         A    Somebody had mentioned the situation to Liz,

9    and she wanted to know what she was getting herself

10   into, what kind of -- what kind of owner he is.

11        Q    And you guys thought that showing her the

12   video footage of that night --

13        A    Somebody -- one of the employees mentioned

14   it to her, and she was -- she asked questions.  And

15   Robert thought it'd be a good idea, and then I walked

16   to the back and they're all watching it.

17        Q    You mentioned an Alexia.  Do you know her

18   last name?

19        A    No, I don't.  I have everybody's last name

20   that I can text to you all.  I promise.

21        Q    Okay.  I'm asking what you know right now.

22   So if you don't, that's fine if you don't.  And we can

23   follow up later.

24             I think you mentioned an Alma.  You said

25   Alma, Jessica, Jackie.  How do you spell Alma?

                                            Page 37

APP.0065

1        A    A-L-M-A.  Those are my shift leads.

2        Q    Do you know what Alma's last name was?

3        A    Negative.

4        Q    Do you know Jessica's last name?

5        A    Mm-mm.

6        Q    Do you know Jackie's last name?

7        A    Humphry.

8        Q    Humphries?

9        A    Humphry.

10       Q    Humphry.  You also said that he was kissing

11   cooks on the necks.  Do you know the names of the

12   cooks that he was kissing?

13       A    Enestr.

14       Q    Can you spell that, please?

15       A    I do not know how to spell that.  I think

16   it's E-N-E-S-T-R.

17       Q    Is there an N in there?

18       A    I think so.

19       Q    Enestr?

20       A    Enestr, yeah.  And there was Juan, and

21   Andrew -- well, no, I'm sorry.  What is his name?

22   Anderson.

23       Q    Did you physically see him trying to kiss

24   these cooks?

25       A    That, I did see.

Page 38

1          Q     And what were their reactions from what you

2     could see?

3          A     He pushed him off.  Enestr pushed him off

4     and smiled a fake smile.  He looked at me, like, with

5     his hands up, like what is going on.

6          Q     Did anyone get physical with him?

7          A     No because they don't want to lose their job

8     because they don't -- they're not from here.

9          Q     When you say they're not from here, I think

10    you also said that they don't have papers.  Are they

11    illegal immigrants?

12         A     Yes.

13                    MR. LEE:  Objection to form.

14    BY MS. AVANT:

15         Q     Do you know how he pays them?

16         A     Paycheck.  Some of them might have work

17    visas, but some of them don't.  They have fake papers.

18         Q     Fake papers?

19         A     Yeah, but they were working before I even

20    got hired.  I didn't find that out until later on.

21         Q     That they were illegal immigrants?  How did

22    you find out?

23         A     Because their Social Security was not real.

24    You can tell if a fake Social Security.

25         Q     You said Andrew Lawson quit, and then you

                                           Page 39

APP.0067

1        had to have him come back to help with the situation?

2              A     Yes.

3              Q     And you were able to get him to come back?

4              A     He came back to help me.  He came back for

5        me to help me because I was dealing with Angelo.  And

6        then he had the next two days off, and then he didn't

7        come back.  He said he couldn't work for somebody like

8        that.

9              Q     So he no longer works there?

10             A     No.

11             Q     Larry Miller, he tried to walk out, but

12       ended up helping you?

13             A     Me and Larry have been working together

14       since 2010.

15             Q     You've known him previously?

16             A     Mm-hmm.

17             Q     Do you know if he's still employed at

18       Knockout?

19             A     No, he is not.

20             Q     Do you know why he left Knockout?

21             A     He couldn't work for somebody like that, and

22       also because he was promised pay.  We helped change

23       the menu, and never got reimbursed for it.

24                         MR. LEE:  Objection to form.

25                         MS. AVANT:  What's the objection?

                                                    Page 40

1                       MR. LEE:  Lack of foundation that he

2       actually has knowledge in this.

3       BY MS. AVANT:

4            Q    Did Larry Miller tell you why he quit

5       Knockout?

6            A    Yes.

7            Q    You also said that he threatened to shoot

8       your son.

9            A    Yes.

10           Q    What was your son's name again?

11           A    Brandon Borrego.

12           Q    Can you spell his first name?

13           A    B-R-A-N-D-O-N.

14           Q    Did you physically hear him or -- strike

15      that.

16                Did you actually hear him threaten to shoot

17      your son?

18           A    Yes, he told me right in my face.

19           Q    Did he say it to where your son could hear?

20           A    My son was coming out from the kitchen.  No,

21      he didn't because my son was helping -- was --

22           Q    What was your reaction when he said he was

23      going to shoot your son?

24           A    I got upset.

25           Q    Did you take any physical action towards

                                                       Page 41

APP.0069

```
 1    him?
 2         A    No, I told him he needs to calm down.
 3         Q    Did you fear that he would actually shoot
 4    your son?
 5         A    At that time, I didn't know he carried a
 6    weapon, a gun with him.
 7         Q    So I'm going to ask the question again
 8    because I'm not certain if you answered it.  At that
 9    point in time, did you fear that he would actually
10    shoot your son?
11         A    Yes because he was intoxicated.
12                   MR. LEE:  Was what?
13                   THE WITNESS:  Because he was
14    intoxicated.
15    BY MS. AVANT:
16         Q    You also mentioned a Mariah Smith?
17         A    Yes.
18         Q    She's a Black woman?
19         A    Yes.
20         Q    I think you said that Angelo got mad because
21    she was working behind the bar?
22         A    Yes.
23         Q    What was the problem with Ms. Smith working
24    behind the bar?
25         A    She was Black.
```

Page 42

APP.0070

1          Q     Did anyone file a complaint for the events

2     that took place in December 2021, to your knowledge?

3          A     The complaints were filed to me, and I told

4     him 'cause I thought he should have known -- I mean,

5     he should know about it.  He's the owner.  He should

6     take initiative.  But after that, the girls were just

7     wanting to make their money.  Some, pay for college.

8     Some had kids.  They just wanted to make their money

9     and just go home, and they could make a lot of money

10    there.

11         Q     Did Knockout have a harassment policy?

12         A     Yes, Laurelaine set up a harassment policy

13    when she first got there.

14         Q     So Laurelaine, to your knowledge, put the

15    harassment policy in place?

16         A     Yes, many times, she would speak up and say,

17    Angelo can't do that or say that because it's

18    harassment or it's unethical.  There was no structure

19    there before.

20         Q     To your knowledge, Laurelaine put HR in

21    place?

22         A     Yes.

23               THE REPORTER:  We're going off the

24    record at 10:29 a.m.

25               (Off the record.)

                                         Page 48

1    leave until 12 at night, or I'll close, open to close,

2    if we were short-staffed.  To answer the question

3    you're asking, hours; right?

4         Q    Hours and days of the week.

5         A    Oh, so six days and sometimes, open to

6    close, sometimes, 12, 14 hours.

7         Q    Which day did you not work during the week?

8         A    Just depends when we're slow, and I was able

9    to get out.

10        Q    Okay.  It would fluctuate?

11        A    Yeah, if somebody was able to cover me.

12   There was one time it was just me and Robert working,

13   and it was kind of hard.  Robert's fresh.  He's new,

14   so he doesn't know a lot.  He did take advantage of

15   Robert a lot, pay-wise and all that.  Robert, I had to

16   help Robert try to get his money 'cause --

17        Q    How many days a week would you say that you

18   worked with Ms. Freeman?

19        A    Because she'd be in different stores, I

20   would see her, like, probably three or four times a

21   week.

22        Q    Three or four times a week?

23        A    A week, yeah.  She would pop up and help us

24   out, make sure we were -- it was basically,

25   like -- like, kind of back-to-back days a lot.

Page 64

1          Q    And how many times did you see Mr. Park in

2     any given week?

3          A    So in the beginning, a lot.  And then when

4     he started messing up, he'll disappear or he'll come

5     to the back door.  So I'd probably see him, like,

6     maybe two or three times a week.

7          Q    So in the beginning, how often did you see

8     him?

9          A    I'd probably see him every day.

10         Q    Every day?

11         A    Not every day, probably four to five times.

12         Q    Four to five times a week?

13         A    And then the incident, he didn't want to

14    come to Northwest Highway anymore and he'd come to the

15    back door.

16         Q    Okay.  Let me just clean up my questions and

17    your answers.

18         A    Okay.

19         Q    Initially, you had seen Mr. Park four to

20    five times a week?

21         A    Mm-hmm.

22         Q    After the December 2021 incident, you would

23    see him approximately one to two times a week?

24         A    Once, maybe not even one time a week.

25         Q    And if you did see him, he would come to the

                                             Page 65

APP.0073

1    when I was driving over here.  I forgot the word, but

2    he -- because her past, what she is now.  And he'd

3    always degrade her ex-husband and said that he was

4    better than her and she -- because of her old ways,

5    she shouldn't be -- people like that.  So -- like a

6    goddess.

7          Q    Goddess?

8          A    Maybe I phrased that wrong, but it means

9    something like that.

10         Q    If you think of it, would you please let me

11   know?

12         A    Yeah.

13         Q    To your knowledge, was Mr. Park and Ms.

14   Freeman ever in a relationship?

15         A    No.

16         Q    Did it appear that they were in a

17   relationship in the workplace?

18         A    No.

19         Q    Did people think they were in a

20   relationship?

21               MR. LEE:  Objection to form.

22         A    I did get asked, yes because he kept

23   following her.

24         Q    Who would ask you?

25         A    Staff, but no, they weren't in a

Veritext Legal Solutions
800-336-4000

APP.0074

1    relationship.

2         Q    Did Ms. Freeman ever tell you that she loved

3    Mr. Park?

4         A    No.

5         Q    Did you think Mr. Park loved Ms. Freeman?

6         A    Yes.

7         Q    Other than the December 2021 incident, did

8    anyone ever complain to you about Mr. Park's behavior?

9         A    Yes.

10        Q    Who?

11        A    The staff.  So what he did at my store, a

12   couple days later, he did at another store.  So

13   something happened at Addison that was told by Bryan,

14   the manager, his improper behavior.

15             MS. AVANT:  We have to go off the

16   record.  I think the phone hung up on her.

17             THE REPORTER:  We are going off the

18   record at 11:13 a.m.

19             (Off the record.)

20             THE REPORTER:  We're now going back on

21   the record at 11:14 a.m.

22   BY MS. AVANT:

23        Q    You were describing to me that complaints

24   that you received from staff for Mr. Park?

25        A    Yes, so he continued to do what he did at my

```
 1      friendly -- she was close to everybody, I mean,

 2      she -- yeah, all the managers and everybody.

 3          Q    Do you believe she confided in you more than

 4      some of the other managers?

 5          A    Yes.

 6          Q    And what's your opinion as to why?

 7          A    Well, we worked together a lot.  We also

 8      changed the menu.  It was me, her, Parker.  We'd go to

 9      her house and work on the menu and stuff.  So we built

10      a bond.  We built a trust.

11          Q    So you've been to her house before?

12          A    Yes.

13          Q    You've met her children?

14          A    Yeah, I've seen her kids.

15          Q    Talked about your children with each other?

16          A    Yes, we talked about kids and everything.

17          Q    Did she tell you she's been in a

18      relationship with Angelo for four years?

19          A    She's never been in a relationship with

20      Angelo for four years.

21          Q    Do you know that she's professed her love to

22      Angelo via text and in other ways?

23          A    No, she's never done that.

24          Q    Did she tell you that she got pregnant from

25      Angelo?
```

Page 122

APP.0076

1    it and I saw how -- whatever she told me was true

2    because I saw it and I saw how she acted towards -- I

3    saw how he acted towards the employees and stuff.  I

4    believe what she told me, and I saw text messages and

5    stuff.  I never saw what you're telling me.

6         Q    Objection.  Nonresponsive.

7              I'm asking if Ms. Freeman was actually in a

8    relationship with Mr. Park, a sexual relationship with

9    Mr. Park, a relationship where she professed her love

10   to Mr. Park, does that change your opinion as to

11   whether or not Ms. Freeman was telling you the truth?

12             MS. AVANT:  Objection to form.

13        A    I don't really understand that question.

14        Q    Why do you think she wouldn't tell you about

15   her full relationship with Mr. Park?

16             MS. AVANT:  Objection to form.

17        A    Because it's make-believe.  Mr. Park

18   make-believed it.

19        Q    So you believed everything Ms. Freeman told

20   you?

21        A    Well, I mean, I saw it, everything.

22        Q    You did see everything?

23        A    Well, what I saw at that period of time I

24   was there.

25        Q    Did you know that he paid her utilities?

Page 124

APP.0077

1    of his behavior.  He's never going to change.  And she

2    loved the company a lot and wanted to help the girls a

3    lot, but it was time to go a different route.

4         Q    Did she tell you she quit?

5         A    Mm-hmm.

6         Q    Did she quit because she was tired of

7    Angelo's behavior, essentially?

8         A    Angelo's situation.  It's always been

9    Angelo's situation.  And she's not the only one.

10         Q    She didn't tell you that she essentially

11    broke up with him, their relationship at that point in

12    time?

13         A    They were never together, so I don't know

14    why she would --

15         Q    I'm sorry?

16         A    They were never together, so I don't know

17    why she would tell me that.

18         Q    Well, you don't know what you're talking

19    about, sir.  I'm sorry to tell you that.

20              MS. AVANT:  That's not a question.  You

21    don't have to harass him.

22    BY MR. LEE:

23         Q    Let me ask you this.  Why are you so certain

24    there was never any type of relationship of romantic

25    or sexual variety between Ms. Freeman and Mr. Park?

                                        Page 134

APP.0078

```
 1              CERTIFICATE OF DEPOSITION OFFICER
 2              I, DAWN TOWNSEND, the officer before whom
 3      the foregoing proceedings were taken, do hereby
 4      certify that any witness(es) in the foregoing
 5      proceedings, prior to testifying, were duly sworn;
 6      that the proceedings were recorded by me and
 7      thereafter reduced to typewriting by a qualified
 8      transcriptionist; that said digital audio recording of
 9      said proceedings are a true and accurate record to the
10      best of my knowledge, skills, and ability; that I am
11      neither counsel for, related to, nor employed by any
12      of the parties to the action in which this was taken;
13      and, further, that I am not a relative or employee of
14      any counsel or attorney employed by the parties
15      hereto, nor financially or otherwise interested in the
16      outcome of this action.
17      Dated: September 8, 2023
18
19                                    DAWN TOWNSEND
20                            Notary Public in and for the
21                                    State of Texas
22
23      [X] Review of the transcript was requested.
24
25
                                           Page 170
```

```
1                    CERTIFICATE OF TRANSCRIBER
2            I, PROMY ISLAM, do hereby certify that this
3    transcript was prepared from the digital audio
4    recording of the foregoing proceeding, that said
5    transcript is a true and accurate record of the
6    proceedings to the best of my knowledge, skills, and
7    ability; that I am neither counsel for, related to,
8    nor employed by any of the parties to the action in
9    which this was taken; and, further, that I am not a
10   relative or employee of any counsel or attorney
11   employed by the parties hereto, nor financially or
12   otherwise interested in the outcome of this action.
13   Dated: September 8, 2023
14
15                                          PROMY ISLAM
16
17
18
19
20
21
22
23
24
25
                                              Page 171
```

APP.0080